**1815.**
**DECEMBER.**

Owings & Cheston
vs
Nicholson & Williams

OWINGS & CHESTON vs. NICHOLSON & WILLIAMS.

APPEAL from *Baltimore* County Court. This was an action of *assumpsit* for money had and received, laid out and expended, and lent and advanced. The defendants, (now appellants,) pleaded the general issue.

1. At the trial the plaintiffs, (the appellees,) read in evidence a bill of lading signed by *Henry Yearly*, master of the brig *Hunter*, dated the 18th of August 1810, for the whole of the cargo of the said brig, shipped by *Samuel Wright* at the port of *Baltimore*, and bound to *Martinique*, and there to be delivered to *Silas Marean*. And an indorsement made on said bill of lading by *Wright*, on the 24th of August 1810, while the brig was on the high seas prosecuting her voyage to *Martinique*, whereby, in consideration of the sum of one dollar, he assigned, &c. to the plaintiffs, the bill of lading, and the merchandise therein mentioned. They further gave in evidence, a deed regularly executed, delivered, acknowledged and recorded, from *Wright* to them, dated the 24th of August 1810, being in trust to secure the plaintiffs as endorsers, whereby was conveyed to them a tract of land called *Stratton*, in *Queen-Anne's* county; also the brig called the *Hunter*, together with her tackle, &c. also all and singular the cargo, goods, &c. laden or to be laden on board the said brig, during her then voyage, and all the profits and proceeds thereof, &c. They also gave in evidence, that the brig, with her cargo on board, sailed on or about the 18th of August 1810, on her voyage to the Island of *Martinique*, where she arrived on or about the 5th of October in that year. They further gave in evidence the deposition of *Benjamin Noland*, taken on their part, stating, that he sailed from the port of *Baltimore* on or about the last day of August 1810, to the Island of *Martinique*; that he went out by the order of the defendants, and *Andrew, Benjamin, James* and *Thomas Ellicott*, or *Elias Ellicott*, but he believes *Thomas Ellicott*, to seize the cargo of the brig *Hunter*, capt *Yearly*, that sailed a few days previously thereto from *Baltimore* to the Island of *Martinique*, with a cargo of flour belonging to *Samuel Wright*. He had a letter to that purpose from the defendants, and the said *Ellicotts*, to seize the said cargo for the purpose of securing debts due to them respectively from *Wright*. He arrived at *Martinique* in September 1810, and before the arrival at that place

*S W purchased a quantity of flour from O & C. for the payment of which he gave them his promissory note, on the 10th of August 1810, payable 85 days thereafter, and he shipped the flour to Martinique on the 18th of August consigned to S D, where the vessel arrived on the 5th of October. On the 24th of August, while the vessel was prosecuting her voyage, S W assigned the bill of lading of the flour to N and W, to indemnify them as his endorsers on certain promissory notes, which they had paid, being more than the value of the flour. S W, when he assigned the bill of lading to N & W, was wholly insolvent, and was discharged as an insolvent debtor under a special act of insolvency passed in November 1810, but he was in good credit when he purchased the flour. About the last of August, O & C sent their agent to Martinique to seize the cargo of the vessel, for the purpose of securing the debt due to them He arrived there before the vessel, and caused a suit to be instituted in the court of St. P, and when the vessel arrived the cargo was seized and condemned for the amount due to O & C. After this B N, stating himself to be the agent of N & W, instituted*

counter proceedings in the said court, to which N & W were made parties, and that court definitively decreed a sale of the cargo for the payment of the claim of O & C, the amount of which was paid by S D in pursuance of the said decree, to the agent of O and C, who paid it over to them—*Held,* that it was competent for the agent to give evidence that the money he received from S D was paid in pursuance of the decree of the court of St. P—*Held* also, that N & W were entitled to recover from O & C, in an action for money had and received, the sum of money so by them received—*Held* also, that the proceedings of the court of St. P. were sufficiently authenticated to be read in evidence, it being proved, by a witness skilled in the *French* laws and in the proceedings of the *French* tribunals, that they were authenticated in the manner used and authorised in the territories and tribunals of *France.* The signature thereto of the chief judge of the said court being proved, and the seal affixed thereto being proved to be similar to that used at the same time as the colonial seal of another *French* island—*Held* also, that N & W could not offer in evidence by B N, that he had no instructions from them to institute any proceeding whatever on their behalf in *Martinique,* and that on his return, and communicating to them what he had done in the court of St. P they disapproved and disavowed his acts—*Held* also, that the judgment and proceedings in the court of St. P. do not affect the right of N & W to recover from O & C the said sum of money by them received of their said agent.

of the brig *Hunter.* He received from Mr. *C. B. Tuttle,* the partner of *Silas Marean,* the consignee of the said cargo, and who was then absent from the Island, the sum of $6700, and upwards, about the last of October 1810, being part of the proceeds of the cargo of the brig *Hunter,* received for the account of the defendants, and the *Ellicotts.* He returned to *Baltimore* in November or December 1810, with the said sum of $6700, and upwards, which he then paid over to the defendants and the *Ellicotts,* on account of their respective claims due by *Wright* to them. He took to *Martinique* with him separate powers of attorney from the defendants, and from *Andrew Ellicott,* and others, which said letters of instructions herein before mentioned, and powers of attorney, he delivered up, according to the best of his recollection, to the parties who gave them to him, but he is not certain whether he delivered the powers of attorney up to the parties, or whether he left them at *Martinique.* The plaintiffs further gave in evidence the agreement signed by the counsel, and annexed to the deposition of *Noland,* in these words: "It is agreed that the annexed deposition be read in evidence in the above cause, so far as the same matters contained are competent and legal evidence." They also gave in evidence, that *Noland,* on his return from the Island of *Martinique* to *Baltimore,* sometime in November or December 1810, paid to the defendants the sum of $735, part of the said sum of $6700, which part was claimed by the defendants as being due to them from *Wright,* by virtue of a certain promissory note from him to them made on the 15th of August 1810, and payable 85 days after date, for $735; which note they gave in evidence. And the plaintiffs, for the purpose of proving the precise sum paid by *Noland* to the defendants, produced *Samuel Sterett,* who proved that *James Cheston,* one of the defendants, did, immediately after the arrival of *Noland,* deliver the said promissory note to the witness, and requested him to deliver it to *Wright,* or his trustees, as they the defendants had received the amount thereof in consequence of an attachment, or some legal proceeding in the *West Indies;* that the witness did go to the counting-house of *Wright,* for the purpose of delivering the said note, but not finding him there, he afterwards presented it to *N. F. Williams,* one of the present plaintiffs, who declined receiving it. The defendants then offered to read in evidence the cross examination of *Benjamin Noland,* taken at the same time with the direct examination, under the agreement of counsel herein before set forth, to wit: "The said *Benjamin Noland* being cross examined on behalf of the defendants, upon his oath answereth and saith: *Interrogatory* 1st. When you arrived at *Martinique* did you seize the cargo of the brig *Hunter,* or institute any process against it on the part of the defendants? To which he answers, that when he arrived there he employed a lawyer to seize the cargo, and the lawyer instituted a suit in the court of *St. Pierres,* and when the brig arrived, the cargo

1815.

Owings & Cheston
vs
Nicholson & Williams

was seized and condemned for the monies due to the defendants and Messrs. *Ellicotts.* That Mr. *Benjamin Nicholson,* declaring himself to be the agent of the plaintiffs, instituted counter proceedings in the said court, to which the plaintiffs were made parties, and that the court definitively declared a sale of the property for the payment of the claims of the defendants, and *Ellicotts.* That the sum of money the deponent received from Mr. *Tuttle* was paid in pursuance of the decree of said court." To this evidence the plaintiffs objected; but the Court, [*Hollingsworth,* A. J.] was of opinion, that it was competent evidence to prove that the money was paid by *Tuttle,* and that *Noland* received the money in the character, and under the impressions stated in his last mentioned deposition, and no further; and it was read accordingly. The defendants excepted.

2. The plaintiffs further gave in evidence, that the brig *Hunter* was the property of *Wright,* and that on the 15th of August 1810, he was, and during his life afterwards continued to be, a citizen and resident of this state; and that the plaintiffs and the defendants, and the *Ellicotts,* then were and yet are citizens and residents of this state; and that the cargo of the brig *Hunter,* mentioned by *Noland,* is the same cargo of the brig *Hunter,* mentioned and contained in the deed and bill of lading aforesaid. They also gave in evidence, that they, for the accommodation of *Wright,* and without any other consideration or motive, did endorse and draw for *Wright* the promissory notes in the deed of August the 24th 1810 enumerated, which notes were discounted by *Wright* in one of the banks of *Baltimore* for his own use and benefit, and the monies arising therefrom was received by him; and also that the plaintiffs took up and discharged the said notes as they severally became due, before the bringing of this action. They also gave in evidence, that the whole property assigned to them in and by the said deed and assignment, was not sufficient to reimburse them for the sums by them paid in discharge of the said notes The plaintiff then prayed the court to direct the jury, that if they believed the facts stated on the part of the plaintiffs, and that the articles mentioned in the bill of lading were the property of *Wright,* who shipped the same on the 18th of August 1810, on board the brig *Hunter,* then bound on a voyage to the Island of *Martinique,* in the *West Indies,* and consigned them to *Silas Marean* of that Island, for sales and returns, that immediately afterwards the brig, with the said articles on board, sailed and proceeded on the said voyage; that on the 24th of the said month, and long before the arrival of the brig at *Martinique, Wright,* for a valuable consideration, sold, transferred, and assigned the said articles in the bill of lading mentioned, to the plaintiffs, by an assignment under his hand of the said bill of lading, and also by the deed aforesaid; that the brig and

cargo arrived at *St. Pierres,* in *Martinique,* some time in 1815. the beginning of the month of October in the same year, when and where the cargo was delivered by the master of the brig to a certain *C. B. Tuttle,* the co-partner in trade of *Silas Marean,* and were by him sold, and the proceeds thereof, amounting to $6700, and upwards, were by him received; that the defendants, together with *Andrew Ellicott,* &c. having demands against *Wright,* sent out to *Martinique* a certain *Benjamin Noland* as their agent, with instruction to seize the cargo for the purpose of satisfying the demands which they had against *Wright;* that *Noland* did, as their agent, without the authority of *Wright,* or of the plaintiffs, or either of them, receive from *Tuttle,* some time in the month of October 1810, the sum of $6700, and upwards, being part of the proceeds of said cargo, as payment of the said demands; that *Noland* on his return from *Martinique,* some time in the month of November or December in the said year, paid to the defendants the sum of $735, part of the sum of $6700, and upwards, which was claimed by the defendants as being due to them by *Wright,* by virtue of his promissory note to them of the 15th of August 1810, and payable 85 days after date; that then the plaintiffs are entitled to recover from the defendants the sum so by them received. The defendants then further gave in evidence, that *Wright,* at the time of making said deed to the plaintiffs, was wholly insolvent, and unable to pay his debts; and that he did afterwards apply to the general assembly of this state, and obtained a special act of insolvency, which said act, 1810, *ch.* 169, they gave in evidence; and that *Wright* did, in pursuance of and by virtue of this act of assembly, apply by petition to *Baltimore* county court, who released him as an insolvent debtor; which petition, with all the papers and proceedings thereon, they gave in evidence. The plaintiffs then gave in evidence, that at the time when *Wright* purchased the said flour from the defendants, and gave his note therefor, he was in good credit, and believed himself to be in safe and solvent circumstances, and purchased the flour for the purposes of his general trade. The defendants then proved, that the note given to them by *Wright,* was for part of the flour shipped as aforesaid to *Martinique;* and that *Wright,* at the same time, purchased more flour than the brig would carry; that the surplus was returned to the defendants, and the note was given for the nett amount actually received from them by *Wright.* The court gave the direction as prayed by the plaintiffs. The defendants excepted.

3. The defendants then offered to read in evidence, a paper purporting to be the record of certain proceedings of a court of justice, called the court of *First Instance* at *Saint Pierres* in the Island of *Martinique,* of which the following is a true translation, viz. "We, *John Amans Astorg,* President of the tribunal of the First Instance,

Owings & Cheston
vs
Nicholson & Williams

1815.

Owings & Cheston
vs
Nicholson & Williams

sitting at *St. Pierres*, Island of *Martinique*, certify, that the signatures attached unto the documents hereto annexed, which are—

1st. Copy delivered by *Borde*, chief clerk of the tribunal of our ordinance, of the 6th October 1810, giving permission to Messrs. *B. & J. Ellicott, Andrew Ellicott, Thomas Ellicott,* and *Owings* and *Cheston*, represented by *Benjamin Noland*, to seize, stop, and put a guard on board the brig *Hunter.*

2d. Original attachment for the seizure and arrest made in the hands of Messrs. *Silas Marean* and *Tuttle*, by the sheriff *Dejean*, 6th October 1810.

3d. Certified copy by *Fronzat*, attorney in the county in this Island, of an act of agreement and security relative to the seizure of the flour, signed *C. B. Tuttle, Thomas T. Gantt.* & *Vachier*, the 6th October 1810.

4. Original petition presented to us in the name of the said Messrs. *Ellicotts*, and associates, 9th October 1810, which was duly notified the same day by the constable *Touin*, to Mr. *Samuel Wright*, legally represented in this cause by the consignee of the cargo.

5th. Copy of the interlocutory judgment of the 9th of October 1810, notified by the constable *Bruin.*

6th. Copy of another preliminary judgment of the 10th October 1810, notified by the constable *Rives*

7th. Copy of the process verbal of the viewers, proving the identity of the flour seized with that sold by the plaintiffs to Mr. *Samuel Wright*, notified by the constable *Bruin.*

8th. Copy of the definitive judgment of the 11th October 1810, at the end of which is the security of Mr. *Eml. Gervais*, both notified by the constable *Fayola.*

9th. The copy of an act of opposition signed by *Villette*, attorney of, and notified by the constable *Rives*, for Messrs. *Nicholson* and *Williams*, represented by Mr. *Benjamin Nicholson* their agent.

10th. The legal document, *(la piece legale,)* duly notified by the constable *Bruin* the 16th October 1810, containing *first*—A translated copy, (by the sworn interpreter,) from the *English* language, of a letter addressed the 30th August 1810, by Messrs. *Joseph H. Nicholson* and *Williams*, and postcripted by *Samuel Wright*, to Mr. *Silas Marean*, which contains the confirmation of the powers as well of Mr. *Marean* as agent of Mr. *Wright*, as of Mr. *Benjamin Nicholson* as agent of Mr. *J H. Nicholson* and *N. F. Williams*. *Secondly*—A translated copy by the said interpreter of the deed of conveyance made by the said *Samuel Wright* to the said *Nicholson* and *Williams* the 24th August 1810. *Thirdly* and lastly—Copy of the petition of the said *Nicholson* and *Williams*, by third opposition, *(Tierce opposition)* against our judgment of the 11th October 1810, presented by *De Bernard,* attorney— The whole notified in the name of the said *Nicholson* & *Williams.*

11th. Copy of the definitive judgment of the 16th October 1810, notified the next day, the 17th, by the constable *Berharbe*—Are truly the signatures of *Borde*, chief clerk of the court, of *Pronzat*, *De Bernard* and *Villette*, attorneys in the courts of this Island, of *Touin*, *Dejean*, *Bruin*, *Rives*, *Fnyola* and *Berharbe*, constables in the court of *St. Pierres*, all in their said functions, and that full and entire faith and credit ought to be and are given thereto, as well in courts of justice as thereout. Given forth at our Hotel at *St. Pierres*, *Martinique*, 25th November 1811.

*Astorg.*

Sealed the same day.

(Seal) *Le Maistre*, ste. Isle."

Here follows the certificate of the governor, &c. of the Island of *Martinique*, (in *English*,) dated the 26th of November 1811, with the seal of the government of *Martinique* affixed, and signed,

*"Charles Wale."*

"No. 1. Order to seize, stop, and put a guard on board the brig *Hunter*, Capt. *Yearly*, 5th October 1810.

Upon the petition presented to the tribunal of the first instance, sitting at *St Pierres*, *Martinique*, by Messrs. *Benj.* & *James Ellicott*, and associates, the following has been extracted: Seen and permitted to form in every place where it may be necessary, *opposition* to the departure of the *American* brig *Hunter*, captain *Yearly*, now in this road; and in case it becomes necessary, to establish one or more *Gend'armes* as a guard on board, at the risk, peril and fortune, of whomsoever it may belong; as also permitted to make seizure, arrest or opposition, and even levy execution for the preservation of all the rights of the just owners, and these presents shall be deposited among the minutes of the court. Commanded, &c. at *St. Pierres*, 5th October 1810.

Signed, *Astorg*,
Coll. *Borde.*

Sealed.

*Borde.*

"No. 2. Seizure made in the hands of Messrs. *Marean* and *Tuttle*, the 6th October 1810.

In the year 1810, the 6th of October, in virtue of the order of Mr. The President of the Tribunal of the First Instance of this city, under date of the 5th instant, signed and sealed in legal form, upon the request of Messrs. *B.* & *J. Ellicott*, *Andrew Ellicott*, *Thomas Ellicott*, and *Owings* & *Cheston*, represented by Mr. *Benjamin Noland*, domiciliated in the office of Mr. *Pronzat*, sworn attorney in this Island of *St. Pierres*, I, *Joseph Dejean*, admitted constable, *(matriculated,)* recorded in the tribunal of the first instance in this city, there residing, and here undersigning, notified and left this copy of attachment with Mr. *Silas Marean*, represented by Mr. *Tuttle* personally, in speaking to the latter in his house that he might not be ignorant of the declaration that I seize, arrest provisionally in his hands, all that he might have or owe, will have or will owe here-

1815.

Owings & Cheston
vs
Nicholson & Williams

after, to Mr. *Samuel Wright*, forbidding him in the name of the king and justice, to let escape or deseize himself from, until it shall be otherwise decided by justice, under pain of answering in his proper and private name for the sum of \$6794, principal, exclusive of costs and interest, requiring him to retain the foregoing in his possession, and moreover to make a positive declaration on the present attachment, and support it by oath should need require it; and I have to the said *Silas Marean*, represented by Mr. *Tuttle*, to him, speaking as before recited, declared that summons will be given him in time and place, of all which this is proof.

Signed,                              *Dejean*.

"No. 3. Agreement with *C. B. Tuttle*, and security of Mr. *Thomas T. Gantt* and *Vachier*, upon the seizure of the flour, 6th of October 1810.

This 6th of October 1810, I the undersigned *Caleb B. Tuttle*, *American* citizen, and partner and representative of *Silas Marean*, acting as well in my personal name, as agent of the said *Silas Marean*, considering that the brig *Hunter*, captain *Yearly*, the cargo of which is to us consigned by Mr. *Samuel Wright* of *Baltimore*, was, on its arrival yesterday in this road, seized and arrested at the suit of Messrs. *B. & J. Ellicott*, *A. Ellicott*, *Thomas Ellicott*, and *Owings & Cheston* of *Baltimore*, represented by Mr. *Benjamin Noland*, and that guards have been put on board in virtue of the orders of Mr. the president of the civil court of this city, under date of yesterday, in order to prevent the landing of the flour composing the cargo, and particularly of 653 barrels of flour sold by the reclaimants to the said *Samuel Wright;* and considering moreover the seizure and arrest made in our hands this day by the said claimants, to the prejudice of the said *Samuel Wright*, as also that the said cargo may be placed so as to prevent any unfortunate accident on board, and to profit of the favourable moment for the sale—declare, as well for myself as for the said *Silas Marean*, I render myself guarantee and responsible to the said *B. & J. Ellicott*, *A. Ellicott*, *T. Ellicott*, and *Owings* and *Cheston*, of *Baltimore*, represented here by the said *B. Noland*, for the entire value of all the rights of the claimants, and all the just and founded claims which they can have legally, and exercise against the said *Samuel Wright*, by reason of which they have made the above mentioned seizure, and that only unto the amount of the nett proceeds of the cargo of the said brig *Hunter*, to us consigned, after the sale thereof shall have been made; promising and obliging myself, as well for myself as for the said *Silas Marean*, to pay to the said claimants, or their agents or representative, the amount of the sum which shall be admitted to be to them due by the said *Samuel Wright*, unto the amount of the nett produce of the said cargo; provided the said sum shall prove sufficient to pay what shall be due, immediately as we shall be authorised to make the said payment

by order of justice. And we, *Thomas T. Gantt* and *Antoine Vachier*, both established merchants at *St. Pierres*, after having taken cognizance of the above engagement entered into, as well by Mr. *Tuttle* as by Mr. *Silas Marean* represented by the said Mr *Tuttle*, declare that we render ourselves personally responsible and guarantees for the execution of the said engagement, jointly and severally, with the said *Silas Marean* and *C B. Tuttle*, for which we bind all our estates present and to come  Done at St. *Pierres*, *Martinique*, the said 6th day of October 1810.

Signed,      *C B. Tuttle*, (Seal.)
                *Thos. T. Gantt*, (Seal.)
                *Vachier*, (Seal.)

Signed and sealed in presence of
    (Signed) *Pronzat*
         *Desgault.*

Certified to be conformable to the original remaining in my possession. *St. Pierres*, 10th October 1819.

*Pronzat.*

"No. 4. Petition of Messrs. *Ellicott*, &c. to the judge of *St. Pierres*, against *Samuel Wright*, legally represented by Messrs. *Marean* & *Tuttle*, consignees of the cargo of the brig *Hunter*, 9th October 1810.

To Mr. the honourable the president of the court of the first instance, sitting at *St. Pierres*, *Martinique*. The humble petition of Messrs. *Benja.* & *James Ellicott*, *Andrew Ellicott*, *Thomas Ellicott*, and *Owings* and *Cheston*, all merchants at *Baltimore*, represented in the colony by Mr. *Benja. Noland*, at present at *St. Pierres*, represent Sir, that Mr. *Samuel Wright*, their fellow citizen, had formed the project of a fraudulent bankruptcy, in which he was willing that the petitioners should lose something. For which purpose he transported himself to them the 14th and 15th of the month of August last, and bought the quantity of 653 barrels flour for the sum of 6794 dollars. This flour was afterwards freighted on board the brig *Hunter*, captain *Yearly*, and expedited for *Martinique*. A few days afterwards Mr. *Samuel Wright* suspended his payments, and made a failure, after having made to certain persons, fictitious creditors, a fraudulent conveyance of almost all his property. These culpable underhand dealings, which the laws punish so severely, have given to the petitioners the assurance that Mr *Samuel Wright* intended to despoil them of the price of their flour, and that he would inevitably have executed his design, if they had not exerted themselves to counteract him.  In consequence they have dispatched a light vessel, with Mr. *Noland* their agent, to pursue the vessel which carried away their flour, and have had the happiness that Mr. *Noland* should arrive at *St. Pierres* before the brig *Hunter*, and that on her arrival in port he has detained the vessel and obtained permission to seize the flour. &c. &c.  Mr. *Tuttle*, partner of Mr. *Marean*, consignee of the vessel, and agent or representative of Mr. *Samuel Wright* in this colony, in order to obtain

the release of the flour, has given security, and obliged himself to pay the claim of the petitioners immediately, as by justice the payment shall be ordained. To obtain this end the petitioners request, that it will please your honour to permit them to summons to an audience extraordinary immediately, Mr. Samuel Wright of Baltimore, proprietor of the cargo of the brig Hunter, in the persons of Messrs. C. B. Tuttle and Silas Marean, consignees of the said cargo, to come and hear themselves condemned to pay the petitioners the sum of $6794, the price of the flour by them to him sold, and composing the cargo of the said brig Hunter, with interest, &c. &c. which shall be executed provisionally, &c.——In consequence decree, that the petitioners receive the said sum of Messrs Tuttle and Marean out of the proceeds of the sale of the said cargo, which being done, their obligation shall be discharged, which shall be executed, &c. under all reservation. This is justice.

*Pronzat.*

Seen, &c. permitted, summoned as requested, ordained, &c. at St. Pierres, Martinique, 9th October 1810.

*Astorg.*

In the year 1810, on the 9th October, at the request of B. & J. Ellicott, &c. merchants at Baltimore, represented in this colony by Mr. B. Noland, at present in this city of St. Pierres, for which he is domiciliated at the office of Mr. Pronzat their attorney, situated in this city of St. Pierres, I John Baptiste Touin, constable, admitted and registered in the court of the first instance of this city, there residing, undersigned, notified, and gave a copy of a translation of the different pieces of requests and orders before mentioned, and of the present summons, to Mr. Samuel Wright of Baltimore, proprietor of the cargo of the brig Hunter, in the person of Mr. C. B. Tuttle & Silas Marean, consignees of the said cargo, in speaking to a clerk domiciliated, that they might not be ignorant of a citation to appear this day, the 9th instant, at 11 o'clock in the morning, at the court-house of this city, before Mr. the president of the said court, to see judged to the claimants the object of their demand contained in their petition. All of which I have performed.

*Touin.*

"No. 5. Interlocutory judgment between Messrs. Ellicott's, &c. and Mr. Samuel Wright, legally represented by Messrs. Mareán & Tuttle, 9th October 1810.

Extract from the register of the clerk's office of The Tribunal of the First Instance, sitting in the city of St. Pierres, Island of Martinique, on Tuesday the 9th of October 1810, in the morning, at an extraordinary hearing before us, John Amans Astorg, president of the tribunal of the first instance, sitting in the city of St. Pierres, Island of Martinique, between Messrs. B. & J. Ellicott, &c. and Owings & Cheston, merchants of Baltimore, represented in this city by Mr. Benjamin Noland, plaintiffs, by petition notified by Touin, this day appearing by Mr. Pronzat, at-

torney of one part, and Mr. *Samuel Wright*, represented in this Island by Mr. *Silas Marean* and *C. B. Tuttle*, defendant, appearing by Mr. *Villette*, attorney on the other part. Parties heard, and the attorney of the king in his conclusions on the petition of Mr. *Villette*, and by consent of Mr. *Pronzat*, we order that the documents be exhibited upon which their demands are founded, which shall be communicated in the original, upon a receipt being given in due form. Costs suspended, which shall be executed notwithstanding appeal, on giving security, which shall be received before us in the accustomed manner. Done and given forth by us, the president of the aforesaid tribunal, at *St. Pierres, Martinique,* the day and year aforesaid, and thus signed on the register.

*Astorg,*
*Borde.*"

1815.

Owings & Cheston
vs
Nicholson & Williams

Here follows a certificate of the preceding having been notified, and a copy delivered, to Mr. *Samuel Wright*, represented by Messrs. *Marean & Tuttle*, to appear on the 10th October, at 10 o'clock in the morning, at the court-house, &c. and signed (by a constable, &c.)    *Bruin.*

"No. 6. Other preparative judgment between Messrs. *Ellicotts* &c. and Mr. *Wright*, 10th October 1810.

Extract from the register of the clerk's office of The Tribunal of the First Instance, sitting in the city of *St. Pierres*, Island of *Martinique*, on Wednesday the 10th of October 1810, in the morning, at an extraordinary audience before us, *John Amans Astorg*, president of the tribunal of the first instance, sitting in the city of *St. Pierres*, Island of *Martinique*, between Messrs. *B. & J. Ellicott, A. Ellicott, T. Ellicott*, and *Owings & Cheston*, merchants of *Baltimore*, represented in this city by Mr. *Benjamin Noland*, plaintiffs, by petition notified by *Touin* the 9th of this month, and in execution of the appointment of the said day, appearing by Mr. *Pronzat*, attorney of one part, and Mr. *Samuel Wright*, represented in this Island by Mr. *S. Marean* and *C. B. Tuttle*, defendant, appearing by Mr. *Villette*, attorney, of the other part. Parties heard, and the attorney for the king in his conclusions, we order, before final judgment, that by viewers agreed on or named by the judge in the common form, verification shall be made of the identity of the flour claimed, with that which was sold by the plaintiffs, and that by a comparison of the brands which shall be presented by Mr. *Pronzat*, with that on the barrels, which shall be made report of by a process verbal, the parties present, or duly notified, in order, upon the same being deposited and reported, judgment of what is right may be rendered. The court ratifies the appointment respectively made by the parties of inspectors of Mr. *William Parsons & Hooper*, who are dispensed from an oath, and authorised to name a third, who is also dispensed from oath. Costs reserved, which shall be executed notwithstanding appeal, on giving security, which shall be received before us in the accustomed manner.

1815.

Owings & Cheston
vs
Nicholson & Williams

Done and given forth by us, the president of the aforesaid tribunal, at *St. Pierres, Martinique,* the year and day aforesaid, and thus signed on the register.

*Astorg,*
*Borde.*

We appoint Thursday the 11th of this month, at 8 o'clock in the morning, to proceed in the operation ordered.

*Wm. Parsons.*

*St. Pierres,* 10th October 1810."

Here follows a certificate signed by *J. Rives,* constable, &c. notifying that he had delivered a copy of the preceding appointment and notification of the day, &c. to Mr. *S. Wright,* in the person of Mr. *Silas Marean* & *C. B. Tuttle;* also a copy to Mr. *Villette,* their attorney, to appear, &c.

"No. 7. Process verbal of the inspectors, proving the identity of the flour the 11th October 1810.

Extracts from the minutes of the clerk's office of the tribunal of the first instance, sitting at *St. Pierres,* Island of *Martinique.*

We the undersigned, named to verify the flour arrived from *Baltimore* by the brig *Hunter,* captain *Yearly,* declare, that we transported ourselves this day at 8 o'clock in the morning, to the warehouse of Mr. *Garout,* where the said flour is deposited. We there discovered 653 barrels, marked for the most part *J. Ellicott, E. Ellicott, B. Ellicott,* and some other of the mark *U. L. M.* and by the representation to us made by Mr. *Pronzat,* attorney of the Messrs. *Ellicotts,* of a note of the marks of 653 barrels, we have ascertained the identity of it with those on the barrels. *St. Pierres,* 11th October 1810.

Signed *W. Hooper,*
*W. Parsons.*"

Ordered that the foregoing be deposited in the minutes of the clerk's office of the tribunal of the first instance, thence to be delivered to who may have occasion to require it. *St. Pierres, Martinique,* 11th October 1810.

Signed *Astorg,*
Coll. *Borde.*"

Here follows a certificate of the preceding having been notified to Mr. *Wright,* &c. to appear, &c. as herein before stated.

"No. 8. Definitive judgment.

To all present, and to whom these presents shall come, Greeting. The tribunal of the first instance, sitting in the city of *St. Pierres,* in the Island of *Martinique,* has rendered the following judgment, between the Messrs. *Benjamin* & *James Ellicott, Andrew Ellicott, Thomas Ellicott,* and *Owings* & *Cheston,* merchants of *Baltimore,* represented in this Island by Mr. *Benjamin Noland,* by power of attorney, plaintiffs, by a petition answered the 9th of this month, and in execution of the appointment of the tenth, appearing by *Pronzat,* attorney on the one part, and Mr. *Samuel Wright,* represented by Mr. *Silas Ma-*

*rean* & *C. B. Tuttle,* defendant, summoned this day, appearing by Mr. *Villette,* attorney, on the other part. Parties being heard, and also the King's attorney, the court, considering the result of the process verbal of the verification reported of the identity of the flour with that inspected by the arbiters, has condemned and does condemn the defendant to pay to the plaintiffs, in round dollars, the sum of $6794, being the price for which they have sold him the flour, and comprising the cargo of the brig *Hunter,* which sum shall be accounted to them by the Messrs. *Tuttle* & *Marean,* out of the proceeds of the sale made by them of the cargo; provided nevertheless, that the plaintiffs shall give them bonds and sufficient security, to be accepted by them, for the return at *Baltimore* of the bills which they hold of Mr. *Wright* for the amount of the said flour, which bills shall be, in consequence of the payment made in execution of these presents, null and of no value against the defendant. Which being done shall release them from all demands therefor from all persons whatsoever. Besides, the defendant is condemned to pay interest on the said sum, counting from the day of the demand, and all costs, which shall be executed notwithstanding any appeal under the same security. Commanded and ordered to all constables, who are required to put in execution this judgment; and for that purpose are authorised to resort to summonses, intimations, and other acts, which may be necessary when thereto legally required. In testimony whereof the present judgment has been signed by the president of the tribunal, and by the clerk. *St. Pierres, Martinique,* Thursday the 11th of October 1810, in the morning, at an extraordinary audience.

(Signed on the Record,)    <em>Borde,</em> Clerk, and<br>
<em>Astorg,</em> President.<br>
Coll.   <em>Borde.</em>

Sealed at *St Pierres, Martinique,* the said day.

<em>Le Maistre,</em> Sete. Isle.

I declare in execution of the foregoing judgment, that I render myself security for the return of the bills in *America. St. Pierres,* 11th October, 1810.

<em>Em. Gervais.</em>"

Here follows a certificate of the foregoing being notified to Mr. *Wright,* &c.

"No. 9. Act of opposition by *Joseph H. Nicholson* & *Nathaniel F. Williams,* represented by *Benjamin Nicholson,* 12th October 1810.

At the request of *Joseph H. Nicholson* & *Nathaniel F. Williams,* merchants of *Baltimore,* represented by Mr. *Benjamin Nicholson,* at present in this city, be it signified and declared to Mr. *Tuttle,* merchant of *St. Pierres,* as well in his own name, as consignee of the cargo of the brig *Hunter* anchored in this road, that the claimants formally oppose the said *Tuttle's* paying or letting escape out of his hands, into any other persons whatsoever, the funds which he now has, or shall have, belonging to Mr. *Samuel*

*Wright*, notwithstanding any judgment which may have been obtained by Messrs. *Ellicotts* & *Owings*, merchants of *Baltimore*, calling themselves creditors of Mr. *Samuel Wright*, under pain of paying twice, and also all costs, losses, damages and interest. With declaration that the plaintiffs will prosecute at law, immediately, Messrs. *Ellicotts*, and all others that may be necessary, under all reserves and protestations which he is entitled to; all which I have performed.

*De Bernard.*

The foregoing opposition was notified by a summons of *Bruin* the 12th of this month, conformably to copy.

*Villette.* "

Here follows a certificate of notification to Messrs. *Ellicotts*, &c.

"No. 10. Containing, 1st. Letter of *Nicholson* & *Williams*, and *S. Wright*, to *S. Marean*. 2d. Deed from *Wright* to *Nicholson* & *Williams*. 3d. Petition of *Nicholson* & *Williams* to the judge of *St. Pierres*, dated 16th of October 1810.

1st. To *Silas Marean*, Esquire, *St Pierres, Martinique,*

*Baltimore*, August 30, 1810.

Sir—Mr *Benjamin Nicholson*, the bearer, goes out with full powers to take possession of the brig *Hunter*, and her cargo, lately consigned to you by Mr *Samuel Wright*. He carries with him the deed of indenture, duly authenticated, which conveys the property to *Nathaniel F. Williams* and myself. For your agency in the business, Mr. *Nicholson* is instructed to allow you your regular commission. I understand that an agent is going out for the purpose of attaching this property for the use of Messrs. *Ellicotts*, and others; but Mr. *S. Wright's* notes to them will not be due until November, and they can lay no attachment until that time, even if the property still continued to be *Wright's*. From the intimacy between your brother, *T. Marean* and *N. F. Williams*, we are induced to hope that you will use all exertions for our interest. If the property is sold when Mr. *Nicholson* arrives, you will account with him for the proceeds.

I am, Sir,

Yr. Obt. Servt.

*Joseph H. Nicholson,*

For self & *N. F. Williams*.

Sir—You will please to conform to the above instructions, and oblige your ob't. serv't.

*Saml. Wright.*"

2d. Here follows the deed from *Samuel Wright* to *Joseph H. Nicholson* and *Nathaniel F. Williams*, dated the 24th of August 1810, stating that the said *Nicholson* & *Williams* had endorsed sundry promissory notes for the said *Wright*, to the amount of $22,450, endorsed by the said *Nicholson*, and $8000 endorsed by the said *Williams*, and to secure, save harmless, and keep indemnified, the said

1815.

Owings & Cheston
vs
Nicholson & Williams

*Nicholson & Williams,* as endorsers, the said *Wright* conveyed to the said *Nicholson & Williams,* a tract of land called *Shatton,* lying in Queen-*Anne's* county; also all that brig or vessel called *The Hunter,* together with her tackle, &c. and all and singular the cargo, &c. and all profits and proceeds thereof, also ten shares of stock in the *Union Bank of Maryland,* also twenty shares in the *Union Manufacturing Company,* &c. &c. in trust, that the said *Nicholson & Williams* shall take possession of the said property, and when proper sell, &c. and the proceeds to apply to the discharge of all and every of the said promissory notes, and the balance, if any, pay over to the said *Wright,* &c. Acknowledged before two justices of *Baltimore* county on the 24th of August 1810, and recorded in the records of the said county on the 31st of August 1810.

No. 10 continued. 3d. "To Mr. The President, &c. The humble petition of *J. H. Nicholson* and *N. F. Williams,* merchants of *Baltimore,* represented by Mr. *Benj. Nicholson,* now in this Island, represent, Sir, that the brig *Hunter* sailed from *Baltimore,* and has arrived and moored in this road, with a cargo, the sale of which has been confided to the care of *Silas Marean & C. B. Tuttle.* The arrival of the brig *Hunter* was followed by that of Mr. *B. Noland,* who says he is the representative of the commercial houses of Messrs. *B & J. Ellicott, Andrew Ellicott, Thomas Ellicott,* and *Owings & Cheston,* of *Baltimore.* Mr. *B. Noland* hastened to set up a demand against Mr. *Samuel Wright,* represented by Mr. *Silas Marean* and *C. B. Tuttle,* in order to have a privilege on the proceeds of the cargo of the aforesaid brig. The means which were resorted to by the Messrs. *Ellicotts,* &c. were founded on the fact of their having sold the flour composing the cargo to Mr. *Wright.* A sentence of the court, given the 11th of October inst. pronounces thus—"seeing what results from the process verbal of the verification reported concerning the identity of the flour sold by the plaintiffs, with that inspected by the arbiters, the court has condemned, and does condemn, the defendant, *Samuel Wright,* to pay to the plaintiffs, Messrs. *Ellicotts,* &c. in round dollars, the sum of $6794, for the price of the flour which they have sold him, and composing the cargo of the brig *Hunter;* which sum shall be accounted to them by the Messrs. *Tuttle & Marean,* out of the proceeds of the sale by them made of the cargo, on the plaintiffs giving to them good and sufficient security that they will return at *Baltimore* the notes given by said *Samuel Wright,* for the price of the said flour," &c. Without entering on the discussion of the means which has induced the court to pronounce thus; without contesting the identity of the flour forming the cargo of the brig with that of the flour sold by Messrs. *Ellicotts,* &c. or pretended to have been sold by them, we find it inadmissible in the demand which they have set up. The Messrs *Ellicotts,* &c. had not decided to claim, if they had not believed the

1815.

Owings & Cheston
vs
Nicholson & Williams

the flour was the property of Mr. *Wright*, and had never ceased to belong to him. The court, in rendering the sentence of the 11th of October, had thought the same; but this was all a chimera; in making to cease this illusion, we will make cease the right of Messrs. *Ellicotts*, &c. We will prove to them that they have no pretence on the cargo of the brig *Hunter*; that they have not, in a word, any privilege or claim. The cargo of the brig *Hunter* is not the property of Mr. *Samuel Wright*. Behold, by this reason, only all the rights of Messrs. *Ellicotts*, &c. are dissipated—vanished. A deed made at *Baltimore*, under date of the 24th August last, between *Samuel Wright* and the petitioners, has transferred to the petitioners the right, not only of the cargo, but of the brig also. This deed is clothed with all the forms necessary at the time of its being made; it has invested the petitioners with the objects sold Mr. *Wright* has ceased to be proprietor, and in admitting to Messrs. *Ellicotts*, &c any right whatsoever to the cargo, this right ceased on the sale and transfer made to the petitioners. They present themselves this day with this deed, sanctioned by the authorities of *Baltimore.* They come and demand the execution of this deed—They come and claim the property which has been transferred to them. They exercise the right which they certainly have, and which no one contest with them. The law which the Messrs. *Ellicotts*, &c. have no doubt invoked to sustain their demand, is against them; this law does not give them the privilege, but in the case where the object seized shall be still in the possession of the debtor—shall be still his property. But Mr. *Wright* is no longer proprietor—He has sold it. The objects are no longer in his possession—He has divested himself of it in order to put it in possession of the purchaser. The former sellers have not then any privilege —They have no claim on that which is no longer the property of their debtor. If the Messrs. *Ellicotts*, &c. have yielded their confidence to Mr. *Wright*, the petitioners cannot be responsible for the consequences—let them address themselves to him to make him pay them the sum he owes them, but let them cease to seek a pledge from the property of the petitioners. Already by a judgment you have authorised the petitioners to seize and stop the cargo in the hands of Mr. *Tuttle.* You have now only to annul the pretensions of the Messrs. *Ellicotts*, &c. and this act is easy. The circumstances which militated in favour of the petitioners have been established; they do not leave any doubt of the legitimacy of their claim. But a sentence of the court has pronounced in favour of the Messrs. *Ellicotts*, &c. a privilege on the property of the petitioners. The court, as we have already said, has participated in the same mistake with the Messrs. *Ellicotts*, &c. It thought that the cargo was still the property of Mr. *Wright*; it has pronounced under this belief. The contrary being demonstrated, it will hasten to correct its judgment, and will render justice to whom it belongs. The means of a third opposi-

1815.

Owings & Cheston
vs
Nicholson & Williams

tion is open to the petitioners; they cannot too hastily seize it in order to put the court in a condition to pronounce on the subject of their claim. Having examined this, will it please you to authorise your petitioners to make opposition to the sentence which they make known and declare, to form the objection to the execution of the sentence which was obtained by misrepresentation of the 11th instant. In consequence, permit them to call before the court immediately—*First*, the Messrs. *Benjamin* and *James Ellicott*, &c. merchants of *Baltimore*, represented by Mr. *Benjamin Noland*, now in this city, stating himself as acting by their power of attorney, domiciled at Mr. *Pronzat*, their attorney. *Secondly*, Mr. *Samuel Wright*, represented by Mr. *Silas Marean* & *C. B. Tuttle*, merchants in this city, domiciliated at Mr. *Villette's*, his attorney, to come, see and receive, the petitioner's third opposing to the execution of the sentence—See that the said sentence be declared null and without effect, and as if not rendered—See the parties remitted to the same condition in which they were before the same was rendered, and pronounced by a new judgment; the Messrs. *Ellicotts*, &c. see themselves declared purely and simply not capable of supporting their demand, the aim of their expectations, at all events unfounded—See themselves nonsuited and condemned in all the expenses; saving and reserving to the petitioners all their rights against Messrs. *Marean* & *Tuttle*, to exercise them as they may find them convenient, to obtain the account and the produce of the cargo of the brig *Hunter*, as being the sole and only proprietors under all reservations, and saving also all other rights, actions and conclusions, which shall be executed, &c. This is justice.

Signed     *De Bernard.*

Seen, &c. recognised the third opposition, and permitted to be summoned to the end requested, commanded, &c. *St. Pierres*, 16th October 1810.

Signed,     *Astorg*,
  Copy   *De Bernard.*"

Here follows a certificate of notification by the constable to Messrs. *Ellicotts*, &c. of the letter, deed, &c. to appear the 16th October 1810, before the president, &c.

"No. 11. *Definitive judgment*, &c. 16th October 1810.

To all present, and to whom these presents shall come, greeting. The court of the first instance, sitting in the city of *St. Pierres*, Island of *Martinique*, has rendered the following judgment between Messrs. *J. H. Nicholson* & *N. F. Williams*, merchants at *Baltimore*, represented by Mr. *B. Nicholson*, now in this Island, plaintiffs, by a petition answered this day in third opposition to the execution of the sentence of the 11th of this month, appearing by Mr. *De Bernard* attorney of the one part, and Messrs. *B.* & *J. Ellicott* &c. merchants of *Baltimore*, represented in this Island by Mr. *B. Noland*, under power of attorney, defendants, appearing by Mr. *Pronzat* attorney of the other part. And also Mr. *Samuel*

1815.

Owings & Cheston
vs
Nicholson & Williams

*Wright*, represented in this Island by Mr. *Silas Marean* & *C. B. Tuttle*, merchants, and his consignees, appearing by Mr. *Villette*, attorney, defendant, summoned to this day, of the other part. The parties being heard, and the king's attorney in his conclusions—The court has taken cognizance of the declaration of Mr. *Villette*, that conformably to the instructions which he has received from Mr. *Samuel Wright*, Mr. *Tuttle* adheres to the conclusions taken by the plaintiffs. Wherefore, the court considering the epoch of the sale of the flour by the Messrs. *Ellicotts*, &c. and that of the deed consented to by Mr. *Wright*, for the benefit of Mr. *Nicholson*, the one on the 15th, and the other on the 24th. Considering that the said deed announces that it is only a deposit for the payment of the notes which have been or may be given by the said *Nicholson* to *Wright*, that thus there has been no definitive transfer of the property. Considering besides, the quality of Mr. *Nicholson*, relatively to Mr. *Wright*, that of relationship. Considering. in consequence that the flour has never ceased to be for the benefit of Mr. *Wright*, and that the privilege of the reclamation is yielded to the seller, when he finds the merchandise sold in the possession of the purchaser, independently of whatever might result from the failure of Mr. *Wright*. The court has cast, and does cast, the plaintiffs from the reclamation—condemns them in a fine of 150 livres, to be applied according to law; and also in all costs of suit—which shall be executed, notwithstanding any appeal, in giving security, which shall be received before us in the customary way. Commanded and ordered to all constables who are required to put in execution this judgment, and for that purpose are authorised to resort to summonses, intimations, and other acts, which may be necessary when thereto legally required. In testimony whereof, the present judgment has been signed by the president, and by the clerk. *St. Pierres*, *Martinique*, Tuesday the 16th of October 1810, in the morning, at an extraordinary audience. Signed on the register, *Borde*, clerk, and *Astorg*, president.

Coll. *Borde*.

Sealed at *St. Pierres*, *Martinique*, the said day.
(LS) *Le Maistre*, Ste. Isle."

Here follows a certificate of notification to Messrs. *Nicholson & Williams*, *S. Wright*, and their attornies, and agents, &c.

The defendants also proved, by a witness skilled in the *French* laws, and in the proceedings of the *French* tribunals, that the said paper is authenticated in the manner used and authorised in the territories and tribunals of *France*. That the signature "*Astorg*," subscribed to the attestation on the first page of the said paper, is the signature and hand-writing of *Jean Amans Astorg*, who, at the time when the said attestation bears date, was chief judge or president of the said court, in the attestation and paper mentioned, and that the seal affixed to the attestation in

the first page, is precisely similar to the seal used at the time in *Gaudaloupe*, as the colonial seal of the latter Island; for which reason the witness believed it to be the colonial seal at the time used in *Martinique* for the authentication of judicial proceedings, and other public acts and papers; but that he had no knowledge of the colonial seal of *Martinique* at that time; and that at that time the courts of *Martinique* had no particular or appropriate seals for their own proceedings, but used the colonial seal for all purposes when a seal was necessary. The plaintiffs proved by the said witness, that according to the laws of *France*, and the constitution and practice of *French* courts, and of the court of the first instance at *Saint Pierres*, in *Martinique*, no part of the proceedings in any case is lodged with the register of the court, or recorded, except the judgment of the court itself, and such acts as were done by its express order, such as the process verbal, which it ordered to be made and returned, and certificates of commissioners appointed by it, to ascertain and report any fact; but that the petitions or claims of the parties, the orders for citation founded on them, the citations made in pursuance of such orders, the answers of the opposite party, the documents produced by either party in support of the claim or defence, were considered as the private papers of the parties respectively, and were not lodged in court, or recorded, but remained in the possession of the advocates of the parties respectively, by whom the originals were produced and certified under their hands, whenever it became necessary to use those papers; and that in such cases the truth or solemnity of those signatures was attested by the president of the court, under the colonial seal. The plaintiffs then objected to the reading of the said papers, or any part thereof, as evidence. But the court over-ruled the objection, and permitted the paper, and every part thereof, to be read in evidence by the defendants. The plaintiffs excepted.

4. The plaintiffs then produced *Benjamin Nicholson*, the person mentioned in the said paper and proceedings in *Martinique*, and offered to swear him as a witness, to prove, that when he went to *Martinique* to obtain possession of the cargo of the brig *Hunter*, he had no authority of any kind, or instructions, from the plaintiffs, or either of them, to institute any legal proceeding whatever on their behalf in the Island of *Martinique*, or to appear for them in any such proceeding, or in any court, further than such authority may have been given him in and by a certain letter addressed by *Joseph H. Nicholson*, one of the plaintiffs, to *Silas Marean*, of which letter, a paper purporting to be a true copy, is contained in the paper proceedings aforesaid; and also, that as soon as the proposed witness returned to *Baltimore* from *Martinique*, and communicated to the plaintiff, *Joseph H. Nicholson*, the steps which he the proposed witness had taken about the said cargo in the said court of first instance at *Saint Pierres*, the said plain-

**1815.**

Owings & Cheston
vs
Nicholson & Williams

tiff disapproved those steps and disavowed them. But the defendants objected to this evidence; and the court sustained their objection, and refused to permit the evidence to be given to the jury. The plaintiffs excepted.

5. The plaintiffs then prayed the opinion of the court, and their direction to the jury, that the judgment and proceedings in *Martinique* do not affect the right of the plaintiffs to recover in this action. And this opinion the court gave. The defendants excepted. Verdict and judgment for the plaintiffs, for $803 40. The plaintiffs and defendants both appealed to this court, but the former afterwards dismissed their appeal.

The cause, on the appeal by the defendants, was argued at the last term on the *first, second,* and *fifth* bills of exceptions, before CHASE, Ch. J. and BUCHANAN, EARLE, JOHNSON, and MARTIN, J.

*Martin, T. Buchanan* and *Winder,* for the Appellants. 1. On the *first* bill of exceptions. The court below refused to permit the defendants to give in evidence that the money was received in pursuance of a decree of the court of *Martinique.* The evidence was offered to show, that the money was so received that *assumpsit* would not lie for it. It was not intended to prove the record or the judgment by the admission of the evidence; but it came in incidentally, and it was not necessary to produce the judgment under which the money was received. If the witness was competent to prove he received the money, he was competent to prove from whom and on what account he received it. It was, and may be important for the defendants to prove, that the money was paid under judicial process; and if they could have been permitted to give such proof, then the plaintiffs would have been bound to produce the judgment, and to prove it to have been erroneous.

2. On the *second* bill of exceptions. The court below referred a question of law to the jury. On the 24th of August 1810, *Wright* being insolvent, and unable to pay his debts, made an assignment of his property to the plaintiffs. They referred to the act of 1805, *ch.* 110, *s* 9, which declares, that any conveyance made to any one by an insolvent debtor, is an undue and improper preference; and the act of 1807, *ch.* 55, which declares what shall be an undue and improper preference. *Manro vs. Gittings & Smith,* 1 *Harr. & Johns.* 492. If *Wright* was insolvent on the 24th of August 1810, the deed was not effectual, and the plaintiffs cannot support this action. It was giving an undue and improper preference to some of his creditors. It was unequitable and unjust, and a fraud as to other creditors. If the plaintiffs are not entitled to recover equitably and fairly against the defendants, they cannot support this action. The agent of *Wright* paid the money voluntarily to the agent of the defendants, on a

full disclosure of all circumstances, and the plaintiffs have no right to call on them to refund.   An agent is answerable to his principal, so that if the payment was not properly made, the agent is answerable to *Wright*, or his assignees.   It is not stated that the property was seized by the defendants, nor that *Tuttle* did not pay the money voluntarily.   If the property was seized, it was done legally.   But the payment was made when there was no legal authority compelling *Tuttle* to pay the money.   No matter whether the money was received by the defendants as a voluntary payment made by the agent, or under a judgment of a proper tribunal, the plaintiffs cannot recover it back in this form of action.   It cannot be said that the defendants received the money for the use of the plaintiffs. It was received in opposition to a claim set up by them against the defendants.   How then can it be said to be received for their use?   Will it be said that the assignees under their assignment, which was made in violation of the policy of the insolvent law, can recover against persons who had an equitable claim?   The deed to the plaintiffs is in express contravention of the laws of this state, and shall the assignees under it recover of the defendants money received legally by them for a valuable claim?   The deed is also void under the act of 1729, *ch.* 8, s. 5, prohibiting secret sales.   This law is confined to property in the state, and could not affect any property not within its limits and jurisdiction.   The *lex loci* must prevail as to personal property.   *De Sobry vs. Terrier*, 2 *Harr.* & *Johns.* 224.   Deeds and wills of personal property must be according to the laws of the place where the property is situated.   Such a deed might be enforced in another country, where there was no equitable claim to the property in another person.   *Hunter vs Potts*, 4 *T. R.* 182.   *Sill vs. Worswick*, 1 *H. Blk.* 665.   The reason why the assignment in the cases cited extended to another country, is given in the cases under an act of parliament extending it.   Can it be said that the defendants are parties to the deed?   It may be said that they have, as citizens of the state, given their assent to the insolvent law.   Such a deed as this would, in *England*, be void as being against the bankrupt law.   It should be so here, being expressly contrary to our insolvent law—being a fraudulent act as it relates to the creditors.   It would be using the court as an instrument to sanction that which the law expressly declares to be improper.   Goods purchased and not paid for, may be seized where the purchaser is insolvent, notwithstanding he ad assigned them, to defraud the creditor, for a valuable consideration.   They may be stopped *in transitu* to pay the seller, notwithstanding his debt is not due. It arises on the high principle of equity, that a man who has sold property, and the purchaser becomes insolvent, shall take his property back, where he has not been paid, and notwithstanding his debt is not due.   The claim is fair and honest.   The rigid rule of law is to bend to the

1815.     equity of such claim. The assignment to the plaintiffs
          covered all the debtor's property, notwithstanding it pro-
Owings & Cheston fesses to say the surplus was to go to the general creditors.
Nicholson & Wil- The schedule shows, that the whole property would not
liams       be more than sufficient to pay the debt to the plaintiffs.
          They cannot recover unless they have a superior equity.
              3. On the *fifth* bill of exceptions. 1. The record of the
          judgment in *Martinique* was admitted in evidence by the
          court below, as stated in the *third* bill of exceptions, (tak-
          en by the plaintiffs and not now before this court,) but
          the court below said it did not affect the plaintiffs' right to
          recover.    They cannot say the evidence was inadmissible,
          because, on their bills of exceptions, this court is not to
          decide.    The questions arising on that record are—1.
          Whether or not the decree therein mentioned is conclusive?
          If it is not conclusive, 2. How far it operates? And if
          it operates at all, 3. How far the plaintiffs have shown
          matter to avoid the *prima facie* operation of it? The
          judgment given by the court in *Martinique* is correct,
          and was properly given on the facts in the case. Those
          facts are correctly stated in the material parts, in the peti-
          tion of *Noland*, the agent of the defendants. If *Wright*
          was guilty of fraud, the plaintiffs are affected by it, and
          answerable for it so far as the defendants are interested.
          The court at *Martinique* condemned the property for the
          benefit of the present defendants, on the proceedings as
          they then stood before the arrival of the agent of the plain-
          tiffs.    When he arrived, he instituted a proceeding fami-
          liar in those courts, called a third opposition to the sentence
          before pronounced by the court.    The agent was properly
          authorised to act for the plaintiffs; if he was not, for what
          purpose was he sent?    He was sent to repel all proceedings
          which the defendants might institute for having their claim
          paid out of the cargo.    The judge at *Martinique* recog-
          nised the agent, and the court were called upon to review
          their former decision, which they did, and decided defini-
          tively on the question in favour of these defendants, hav-
          ing before them all persons concerned, who were the pre-
          sent plaintiffs and defendants.    If *Wright* was guilty of a
          fraud in the purchase of the flour from the defendants, the
          court in *Martinique* gave the same judgment which the
          court here would have given.    That court had jurisdiction
          of the case.    The property was there, and their laws had a
          control over it; and the court had a right to draw the con-
          clusion from the facts, that *Wright* had been guilty of a
          fraud—that court having a right to judge on the law and
          the fact.    The plaintiffs are not considered as aiding, or
          having any knowledge of the fraud; but if *Wright* was
          guilty of a fraud, it will affect their right to recover. *Al-
          lison vs. Matthieu*, 3 *Johns. Rep.* 235.    It was not an or-
          dinary commercial transaction, but was manifestly a
          case of fraud; if it was not, how could the court in
          *Martinique* decide as it did?    The plaintiffs were mere
          trustees, to indemnify themselves for notes endorsed—it

was a resulting trust for any residue. Under the deed of assignment to them, they stood in the place of *Wright.* They did not take as purchasers, but they took the property subject to all claims. The property was never divested out of the defendants, there being a fraud practised on them by *Wright.* It was not a fair commercial transaction; but it is evident that fraud was intended—the purchase having been made with a view to bankruptcy. If the facts had been submitted to a jury of this country, the property would have been recovered by the defendants, from *Wright's* trustees. The court in *Martinique* was invested with cognizance of the case, and perfectly competent to decide. Suppose the property had not been shipped, and an action of trover had been brought by the defendants, would not the jury be bound to draw the legal conclusion, that there was fraud; and if there was fraud in *Wright,* it is equally so in his trustees or assignees. This court would have drawn the same conclusion from the facts, which the court in *Martinique* did; and the same decision has taken place there, which would have taken place here, had the question been brought before a legal tribunal in this state. *Winchester, et al. vs. Brooke,* 2 *Harr. & Johns.* 1. The consignees of *Wright* were equally the consignees of the plaintiffs. The proceedings in *Martinique* is a proceeding *in rem.* Every person who could be, were made parties. *Wright* and his assignees were as much parties as they could be in the case of that kind, or as they would be here on a foreign attachment. If that court had acted upon the laws of this state, it could not have given a different decision—acting upon the civil law, or the law of nations, they could not have decided otherwise. 2. Whether that court had a right to draw the legal conclusion that there was fraud, is not for this court to decide, unless they undertake to constitute themselves a court of review, which it is contended they cannot do, but that they are concluded by the judgment which was given by the court in *Martinique.*

On this question they cited *Hughes vs. Cornelius,* Sir *T. Raym.* 473. S. C. 2 *Show.* 232. *Beak vs. Tyrrell, Carthew,* 32. *Green vs. Wallen,* 2 *Ld. Raym.* 893. *Ewer vs. Jones,* Ib. 935. 12 *Vin. Ab.* 87. 1 *Marsh. on Insur.* 388, 390, 392, 393, 394, 398, 399, 401, 403, 404. *The Christopher,* 2 *Rob. Adm. Rep.* 210, *(note.) Oddy vs. Bovill,* 2 *East,* 473. *Smith vs. Surridge,* 4 *Esp. Rep.* 25. *Bernardi vs. Motteux, Dougl.* 581. *Stodder vs Dunlop,* 2 *Harr. Ent.* 490. *Rose vs. Himely,* 4 *Cranch,* 276. *Hudson vs. Guestier,* Ibid 294. *Croudson vs. Leonard,* Ibid 434, 438. *Fitzsimmons vs. The Newport Insurance Company.* Ibid 186, 197. There can be no question but that admiralty sentences, from the year 1682 to the present time, have been held conclusive. Lord *Kenyon* says, in *Walker vs. Witter, Dougl.* 1, *(note,)* that he knows no reason why the judgments of all foreign courts are not evidence, as well as of admiralty courts. They contended, that the

*1815.*

*Owings & Cheston*
*vs*
*Nicholson & Williams.*

1815.

Owings & Cheston
vs
Nicholson & Williams

case of *Burrows vs. Jemino*, 2 *Stra.* 733, went the whole length of that before the court. In *Cooke's Bank Laws,* 522, cited in *Sill vs. Worswick,* 1 *H. Blk. Rep* 668. the case was abandoned upon the force of the authorities cited. In *Rapalje vs. Emory,* 2 *Dall. Rep.* 51, 231, the decisions referred to were recognized. But it will be said that later decisions are against the principle contended for on the part of the appellants; that in *Hunter vs. Potts,* 4 *T. R.* 182, 192, the money was directed to be refunded, notwithstanding the decision of a foreign court This decision went upon the bankrupt laws, where both parties were *English* subjects, and were bound to know those laws— their assent to them was inferred. *Sill vs. Worswick,* 1 *H. Blk.* 665, was decided on the same principle, of the parties being bound by the bankrupt laws of their own country, and refers to *Le Chevalier vs. Lynch,* 1 *Dougl.* 170. In *Walker vs. Witter,* 1 *Dougl.* 1, there is a class of cases in the notes, making the decision of a foreign court *prima facie* evidence of its correctness, so as to found a claim thereon to enforce it in a court in *Great Britain.* In *Maley vs. Shuttick,* 3 *Cranch,* 488, it was held, that the judgment of a foreign court was evidence of its own correctness. There was nothing to impugn the decision of the court in *Martinique,* which declared that the property was liable to the claim of the present defendants. It was a court of competent authority. Every thing was before the court, and the agent of the plaintiffs was contesting the case, so that it was between the present parties. There is no case which says that a decision between the same parties before a court of competent jurisdiction, is not conclusive. It might be questioned where it was not between the same parties. Were it not conclusive, when between the same parties, there would be no end to litigation. The decision of the court of *Martinique* strengthens the equitable claim of the defendants. What is the effect of a judgment rendered in a domestic tribunal as contrasted with a municipal tribunal? They are conclusive between the same parties in all other jurisdictions. *Bull. N. P.* 244. 1 *Peake's Evid.* 75. *Blackham's,* case, 1 *Salk.* 290. *Harper vs. Carr,* 7 *T. R.* 270. *Contee vs. Cooke,* 2 *Harr. & Johns.* 179. Where the judgment of a foreign court is to be carried into effect, it is different. For instance, where a suit is brought upon a foreign judgment, the court here must be satisfied that it is correct, but it is *prima facie* evidence of the debt. In the case before the court, the judgment was executed— it was at an end, the money having been paid under it; but the plaintiffs come here and claim to have the money paid under the judgment refunded, and paid to them. Before that is done they must show some authority for it, before this court will decide that the judgment is incorrect, and that the money paid under it shall be returned. Where a judgment is executed, there is an end of the subject upon which it was given. All the authorities go to establish the

principle, that where a court is called on to carry into effect a judgment of a foreign state, it would not, until lately, do so; but owing to the peculiar situation of our union, a judgment in one state is conclusive evidence in every other state. There is a uniform system of decisions pervading the commercial world; and a judgment in one court of admiralty is respected in another. That court professes to act upon the law of nations; but in many cases they do not do so, and there have been many complaints upon the subject. Even Sir *William Scott* acts upon the local laws of his own government instead of acting upon the laws of nations. The judgments of such courts are respected; and if so, there is a greater reason to respect the municipal decisions of the country. Although this is not a decision of a *British* court of King's Bench, yet it is a decision of a municipal tribunal. There is a distinction between the judgment of a municipal court which has been *executed*, and where it has not been executed; and there is a wide distinction where the judgment of a foreign court is brought in collaterally, and where it is brought directly before the court. In *Rapalje vs. Emory*, 2 *Dall. Rep.* 51, 231, the court decided, that the decision of the court of *St. Eustatia* was right; but that whether right or wrong, the judgment was conclusive. In *Philips vs. Hunter*, 2 *H. Blk. Rep.* 402, an attempt was made to obtain a preference out of bankrupt's property. The court said, that the judgment of the court in *Pennsylvania* must be taken to be binding between the parties to the suit in the foreign country. The opinion of *Eyre*, Ch. J. shows the true ground of the decision, which was, that the court could not examine into a judgment of a foreign country, when brought before the court collaterally; but that when the judgment was to be enforced, it is examinable. Where the money is paid under a judgment in a foreign country, it cannot be recovered back in the court of any other country. The authorities cited all show this to be the case, except cases arising under the bankrupt laws of *Great Britain*, and between its subjects. If the judgment in *Martinique* was not conclusive, it was *prima facie* evidence of the judgment recovered, and the court below have said it "does not affect the plaintiffs' right to recover." Why did it not affect their right to recover? Was it not *prima facie* evidence of the debt recovered? The court permitted it to go to the jury, and then directed them that it was not to affect the plaintiffs' case; that it had no force, validity or effect. Why permit it to go to the jury if it was to have no effect? Can this court sanction such a decision? If the judgment offered in evidence was correct, then there is an end of the case, and the judgment of the court below must be reversed.

*Harper*, for the Appellees. 1. On the *first* bill of exceptions. An attempt was made by the defendants below, to prove that the money was received by their agent, under

a judgment of a foreign court, without producing the judgment. Here was an attempt then to prove a judgment by parol. Can such proof be admitted? The rule of law is, that you cannot give parol evidence of a written paper, more especially of a record. The evidence offered to be given by Mr. *Sterett* was mere hearsay, and was not sufficient to let in the evidence offered by the defendants, to prove that *Tuttle* paid the money to *Noland* under a judgment. Whether the money was received in pursuance of the judgment, is to say that the judgment existed. Could it be evidence of the judgment, when the judgment, if any, might be produced? The witness might be mistaken, and the judgment was the best evidence.

2. On the *second* bill of exceptions. The objection to the opinion given by the court below on the statement in this exception, is that the court referred a question of law to the jury. The prayer was, that if the jury believed the facts stated, then the plaintiffs were entitled to recover. The consequence in point of law was, that if the jury found the facts, then the plaintiffs were entitled to recover. The legal conclusion was to be drawn from the facts being found to be true. But it has been said that this is an equitable action, and that the plaintiffs cannot recover, their claim being an inequitable one. That *Wright* made the assignment to defeat his creditors, giving an undue and improper preference, which our insolvent laws will not suffer. That the assignment was fraudulent; and yet evidence was given, that when he purchased the flour he was in good credit, and that the purchase was made solely for the purposes of general trade. There was surplus flour returned to the defendants, and this shows that no fraud was intended. There was no fraud, or the want of equity existing, to prevent a recovery by the plaintiffs. If a legal right was shown for the money, then the action will lie. There was not an undue and improper preference. The act of 1807, *ch. 55*, speaks of an undue and improper preference, and that it should be void. Does the act refer to the bankrupt laws as a system? It must refer to the common law. It was not an improper preference in equity. Under our laws a debtor may prefer one creditor to another. Under the bankrupt law, while it existed, such an assignment would not have been decided to be an undue and improper preference, and therefore void. *M'Mechen vs. Grundy & Thornburgh's Lessee*, 3 *Harr. & Johns.* 185. The insolvent laws do not say the deed, giving an undue and improper preference, shall be void, but that the party making it should not be entitled to the benefit of the law. It is not true that an action cannot be supported for an equitable demand; and if were true, it is not true that the preference here given makes the deed void, and the demand inequitable. But here the question must depend upon the general law, and not upon the insolvent laws. There was a special insolvent law in favour of *Wright*, and his case was extracted from the ge-

1815.

Owings & Cheston
vs
Nicholson & Williams

neral insolvent law. The general system of our insolvent law, if taken into view, will be found to be this, that if there has been *an undue and improper preference*, the petitioner shall not be discharged. What is an undue and improper preference under the act of 1805, *ch.* 110, that law does not determine. But it is said, that the act of 1807, *ch.* 55, does. This last act has nothing to do with the case. The special law, in favour of *Wright*, refers the question to the general or common law, not to the insolvent law system of the state. It comes under the general and legal principle, whether it is an undue and improper preference to secure a surety. There is no general system of insolvent law which stands in the way but the act of 1774, *ch.* 28, and that act does not. This is not a case falling under the insolvent laws. It is a special law of its own. There is no general system of insolvent laws, and nothing to which the court can look, but to the general law of the land. If there was a general insolvent system, this case would not come under it, there being here a special law in *Wright's* favour. But it has been said, that the plaintiffs were mere trustees for *Wright*, and that the case is to be considered as if between him and the defendants. They are trustees, but for whose benefit? Not for the benefit of *Wright*, but for themselves; and they are the owners in law and equity. They are as much the owners of the property as if no trusts had been stated in the deed from *Wright* to them. The liabilities had been incurred by them, and only a few days had to elapse before the notes would fall due. They paid the notes before the proceedings were commenced in *Martinique*, and when the decision took place, they were interested as purchasers for a valuable consideration. This cannot be called a trust estate. There was an eventual interest in *Wright*, but the whole property was inadequate to the indemnity of the plaintiffs. There is nothing to distinguish this from the ordinary case for a transfer of a valuable consideration. There was no lingering equity remaining in *Wright*. The spirit of the deed was, that the plaintiffs were to have absolute control of the property. How were they to get indemnity, unless they had such control, provided the deed was upon such a consideration which the law will sanction? Here was a proper consideration—sureties to be indemnified. There is no transaction which the law will sanction sooner than this. The law does not condemn it. The commerce of the country depends upon a wide spread credit. How is credit to be obtained unless there is security? The law will allow that he who gives his aid to credit shall be secured, where no interest is asked for his securityship. He asks indemnity, and shall he be refused? Is it not for the public good that the surety shall be indemnified? That when the principal is tottering upon the verge of ruin, he may step forward and secure him who had pledged his fortune in his behalf? It is the first axiom in commercial transactions. The law will justify the making the indem-

nity.    Will the postponing it to the last moment make any
difference?    The principal is bound to indemnify; and
when a man becomes a surety for another, the principal is
bound,  and engages at the time, to indemnify him  to the
extent of his resources.    Sureties in  every case should be
protected, where there is  nothing in the case which stains
it with impurity.    Here nothing of the kind is attempted to
be shown.    Our insolvent law is as hifting and changeable
system——it is one thing to day,  and  another  to-morrow.
There is no uniform system in it.    Resort must be had to
what was the system before.

*Finkney*, also for the Appellees.  On the *second* and *fifth*
bills of exceptions.    1.  How did the case stand at the time
institution of the proceedings in *Martinique?*    At the time
of  the commencement of those proceedings, and indepen-
dently of the judgment, the plaintiffs had a right to  reco-
ver, 1st.  Under the assignment of the bill of lading.  A bill
of lading is assignable in  its nature,  and  by endorsement
the property is vested in the assignee.    It is clearly set-
tled, that goods at sea may be so assigned.    *Evans vs. Mar-
lett*, 1 *Ld. Raym*, 271.    *Wright vs.  Campbell*, 4 *Burr.*
2051.    *Caldwell vs. Ball*, 1 *T. R.* 216.    *Lickbarrow vs.
Mason*, 2 *T. R.* 74. 5 S. C.  *T. R.* 683.    *Haille vs. Smith*,
1 *Bos. & Pull.* 569.    *Newson vs. Thornton*, 6 *East*, 20,
27.    Upon this principle the property of the goods at sea
is held by the possession of the bill of lading, and the legal
interest of the property is  immediately transferred from
the owner to the assignee  of the consignee, (*a fortiori* to
his own assignee.)    *Pow. on Mortg.* 35, 36.    In this case
*Wright*, the vendee, represents the consignee for value in
the cases cited.    His consignee was  merely a factor for
sales and returns,  and as consignor and owner he retain-
ed power and right to transfer  to the  plaintiffs.    2d.  Un-
der the deed  from *Wright* to them of  the 24th of August
1810, which was duly  acknowledged and recorded.    The
consideration  was a valuable one, and as meritorious as it
could be.    *Lempriere vs. Pasley*, 2 *T. R.* 485.    3 *Bac.
Ab.* 310.    *Twines* case, 3 *Coke*, 80.    *United States vs.
Hooe*, 3 *Cranch*, 88.    *Pow. on Mortg.* 41, 42.    *Coxe vs.
Harden*, 4 *East*, 212, 217. 5 *Bac.  Ab.* tit. *Mortgage*, 52,
cites *Plumb vs. Fluitt*, 2 *Anstr.* 432.

2.  What were the defendants rights  at law?   Having
sold and delivered the flour, it is impossible that they could
have more  than two rights at  law, supposing no fraud in
*Wright*, or even if there was, 1st. Of stopping *in transitu*,
which affects the thing specifically.    2d.  Of attaching for
the debt, as any other creditor might do.   1.  They had not
the right of *stopping  in transitu.*    At common law their
property was  gone by a constructive delivery, and they
were reduced to general creditors.    The right of stopping
*in transitu* was transferred from equity to law.    It took
its rise with  the case of  *Snee vs. Prescott*, 1 *Atk.* 245,
by Lord *Hardwicke*, and is  an equitable specific lien

upon the thing of which the property has passed by another, and goes as far at law as at equity. It exists only in the case of the insolvency of the vendee. It never does or can exist after *actual* delivery to the vendee or consignee. It is an ambulatory right, which follows the property in its transit from the vendor to the vendee or consignee, and then ceases for ever. *Constructive* delivery, (which may be sufficient to alter the property,) does not interfere with it. *Actual* delivery extinguishes it. Now in this case there was *actual* delivery to *Wright* in *Baltimore*, and of course the right of stopping *in transitu* is a chimera. There was no transit to *Wright* in the case. The only material transit was from the vendors to *Wright*. The subsequent transit to *Martinique* was *from Wright*, not *to* him. *Abbott*, 852, 358. 6 *Rob. Adm. Rep.* 326. *Ellis vs. Hunt*, 3 *T. R.* 464. *Leeds vs. Wright*, 3 *Bos. & Pull*, 320. *Coxe vs. Harden*, 4 *East*, 217. The right of the vendor to stop *in transitu*, in case of the insolvency of the vendee, was a kind of equitable lien adopted by the law, for the purposes of substantial justice, and does not proceed on the ground of rescinding the contract. *Hodgson vs. Loy*, 7 *T. R.* 441. *Salomons vs. Nissen*, 2 *T. R.* 679. *Lickbarrow vs. Mason*, *Ibid* 70, 75, 683. There was no right, therefore, of stopping *in trans-tu*, upon which it is observable the court in *Martinique* proceeded. 2. The other legal right at the time of the commencement of the proceeding in *Martinique*, was of *attaching* as a creditor. But that right could not exist for two reasons—1st. The debt was not due. 2d. The property was altered before the defendants proceeded. It belonged to the plaintiffs; and moreover the court at *Martinique* did not decide upon this ground. The defendants had no legal right of any kind therefore, when they commenced their proceeding in *Martinique*. 1. They had not any property in the flour, for they had sold and delivered it to *Wright*. 2. They had not the right of revendication or stopping *in transitu*, because of the actual delivery and possession, independently of the right of the plaintiffs. 3. They had not a right to attach, because their debt was not due, and because the property was passed to third persons.

3. What was the comparative *equity* at the same epoch, that is, at the commencement of the proceedings in *Martinique?* 1. As to the general equity. The plaintiffs' is that of a *security*; the defendants' of a creditor, who sold upon a long credit for profit, or with the expectation of profit. The thing sold is that which they attempt to affect for the purchase money; but that thing had become a portion of the mass of *Wright's* property, and they had taken a security, or note of hand, at 85 days, in lieu of it, and had thus become, and intended to become, mere general creditors. The general equity is at least *equal*. A security is always favoured in equity, and chancery will never raise an equity against him. which the *law*, strictly taken, does not raise. If a security in a *joint* bond dies, and the sur-

viving obligor becomes insolvent, the bond cannot be set up against the security's property in equity, although it could be done against any other joint obligor. If there is any moral obligation which presses more than another upon a trader, it is to indemnify his securities, at least there can be none superior to it A security becomes so from mere friendship, without hope of profit. He risks himself without the chance or expectation of equivalent, and oftentimes at the imminent hazard of run. The whole fabric of our commerce has depended upon securityships, bank negotiations, &c. and it is the fixed idea in the commercial world, that a man cannot do too much for indemnifying his securities. It is in fact the consideration, and the only one, which is paid for securityship. On the other hand the defendants sold for profit; they were not led by friendship, but influenced by calculation. What peculiar favour are they entitled to against those who had staked their whole fortunes, and the prosperity of their families, upon the success of *Wright?* There can be no impeachment of the defendants that they expected profit; but it is a reason why they have no moral claims *above the plaintiffs.* The property had been theirs indeed—but what then? It was theirs no longer—they had made it as much *Wright's* as any other of his goods; and had chosen to rely on his personal credit and solvency. The *general equity* is therefore at least equal. Now what *specific equity* had the defendants? It has been said that they had an *equitable lien beyond the right of stopping in transitu.* 1. All the cases upon the right of stopping *in transitu,* show clearly that it is the *ne plus ultra of equity,* as well as of law The chancery cases do not go beyond it. *Snee vs. Prescott,* 1 *Atk.* 245, did not. Suppose, however, that by analogy to the doctrine of lien for the purchase money in the case of *real estates,* this lien exists. It may be answered, 1. Even in the case of real estates, the lien, by implication, does not exist, where upon the contract it evidently was *not intended to be reserved. Austin vs. Halsey,* 6 *Ves.* 481. Now here it was not intended to be reserved; for a note of hand is taken *with a long credit,* and a knowledge that the goods were intended to be sent out of reach. And it has in one case, *(Fawell vs. Heales, Ambl.* 724. S. C. *Dickins,* 485, determined in 1773,) been decided, that in the case of the sale of real estate, if the vendor parts with it, and takes a bond for the purchase money, he has no lien against the general creditors of the vendee. There is no case that overrules this. The case of *Nairn vs. Prowse,* 6 *Ves.* 759, does not affect it; for the master of the rolls decided no more than the case required, that is, that the taking *a security* did take away the lien by implication. The case of *Pollexfen vs. Moore,* 3 *Atk.* 273, was that of an *agreement* to purchase merely. 5 *Vin. Ab.* (supp.) 180. 2. But at any rate there is no lien by implication against a holder for value, *without notice of the equity.* All the books agree to this,

and it would be nonsense and iniquity if it were other-wise. A vendor has a lien for the purchase money *while the estate is in the hands of the vendee;* that is, against general creditors. *Austen vs. Halsey,* 6 *Ves.* 480. Now the plaintiffs were holders for value, (upon a consideration the most meritorious,) *without notice of the defendants' equity.* There is no notice stated in the bills of exceptions, and *de non apparentibus et non existentibus eadem est ratio.* They must show notice if they mean to stand against a le-gal title upon a claim merely equitable. This is so at e-quity. Even, therefore, if real estate, this idea of lien, be-yond the right of stopping *in transitu,* could not be coun-tenanced. But the doctrine, as it applies to real estates, has nothing to do with this case, which is of personalty. There is no adjudication or dictum to be produced which looks that way. Cases of *stopping in transitu* profess to exhaust the equitable doctrine as it applies to personal things; and *Ex parte Gwynne,* 12 *Ves.* 383, proves that to be so. And besides, the cases of stopping *in transitu* show, that *even while the goods are in transitu,* if they are transferred by the consignee or vendee to a third per-son for valuable consideration, (especially if without no-tice of the equity,) the right to stop *in transitu* is gone. This *while in transitu;* for after they reach the vendee or consignee, there is no right of revendication at all—there is no lien of any kind at law, nor in equity. It results, that the plaintiffs and defendants were in *equal* equity; and that so being in equal equity, the plaintiffs obtained the ti-tle at law—thus uniting law and equity. It results again, as will be shown, that unless the judicial sentence in *Mar-tinique* is competent to prevent it, the plaintiffs are enti-tled to recover, *in this form of action,* the money which be-longed to them, which the defendants got into their pos-session under pretence of title. There are only two possi-ble objections—1. That in this form of action the plaintiffs can recover only upon equitable principles. 2. That there was no privity—the money having been received under an adversary title. 1st. As to equitable principles. The rule in chancery is, that where the equity is equal, he who has the law shall prevail. Per Lord Chancellor *Cowper,* in *Oswicke vs. Plumer,* 5 *Bac. Ab.* 41, 42, Per *Ashurst,* J. in *Caldwell vs. Ball,* 1 *T. R.* 241. Nay, where one equi-ty is prior to the other, but in other respects equal, the last equity shall prevail if it becomes united to a legal title, a-gainst the maxim *"qui prior est in tempore potior est in jure."* Thus where the second mortgagee purchases in (even with notice of the first mortgage,) an incumbrance *anterior* to the first mortgage, he shall overreach the first mortgage in equity. 5 *Bac. Ab.* 55, 56. Nay, where it is only a general equity against a specific equity, if, *without notice of the specific equity,* the other party gets a title at law, he shall prevail against the speci-fic equity. Thus—"although a deposit of title deeds

1815.

Owings & Cheston
vs
Nicholson & Williams

amounts to an equitable mortgage, yet if a creditor of the mortgagor, fearing his immediate insolvency, take a conveyance of the same estate *without notice of the incumbrance*, equity will not prevent him from availing himself of his legal estate." 5 *Bac. Ab.* 53. *Plumb vs. Fluitt*, 2 *Anst.* 432. So that even if the defendants had a specific equity, since the plaintiffs as *securities*, (stronger than the case of a mere *creditor*,) got the legal title *without notice of their equity*, it would not be repugnant to equitable principles that they should be allowed to have the benefit of their legal title. The defendants, however, had no specific equity. They had no equity superior to that of the plaintiffs, who have united the law to their equity. Again —Where there is no peculiar equity on either side, the strict law shall entitle the plaintiffs to a verdict. *De Hayn vs. Hartley*, 1 *T. R.* 343. There is no necessity, therefore, that there should be any peculiar equity with the plaintiffs. It is sufficient if the law is with them, and the claim is not condemned by conscience and honesty. Here it is not so condemned. 2. The want of privity. The rule is, "in an action for money had and received the receipt shall be always deemed to enure to the use of him who hath the right, even though it be taken under an adverse title; as for instance, when this species of action is brought to try the title of an office." *Philips vs. Hunter*, 2 *H. Blk. Rep.* 408. 1 *Vin. Ab.* 268, (*N.* 2.) *pl* 1, 2. *Howard vs. Wood*, 2 *Show.* 21, 24. *Tettenhan vs Bedingfield*, 3 *Leon.* 24. *Arris vs. Stukets*, 2 *Mod.* 360. 1 *Vin. Ab.* (*Supp.*) 99, (*N.* 2.) *pl.* 2, 4; 103, *pl* 10. *Thomas vs. Whip*, *Bull. N. P.* 130. *Hern vs. Nichols*, 1 *Salk.* 289. *Bull. N. P.* 35. 2 *Com. on Cont.* 44. *Moses vs. Macferlan*, 2 *Burr.* 1009. *Astley vs. Reynolds*, 2 *Stra.* 915. *The King vs. The Bishop of Chester*, 1. *T. R.* 403, 399, (and note.) 1 *Bac. Ab.* 260. *Jacobs vs. Allen*, 1 *Salk* 27. 1 *Vin. Ab.* 263, (*N*) *pl.* 2.

4. We come now to consider the effect of the judicial proceeding in *Martinique*. Has it any, and what effect, upon the right of the plaintiffs to recover? The defendants set it up as a flat bar. They say it has decided the matter of the present controversy, and that the plaintiffs cannot recover against a judicial decision, even though a *foreign* decision. We say it is no more than *prima facie* evidence, and scarcely that. 1. In strictness, the courts of one country are not in any degree bound by the judgments of the courts of another. This is the result of their independence and sovereignty, as well with regard to judicial, as to executive and legislative acts. If they are bound by the judicial acts, they are bound by the legislative acts; for the judiciary does but expound, apply, and enforce the legislative will. *Lord Kaime's Pr. of Eq.* 374. But *comity* has in *England* given to them a qualified binding force of considerable extent. And here it ought to be observed, that in *Scotland*, in *France*, and the other nations of *Europe*, no such comity exists. *Ibid.* In *France* a

judgment rendered in this country would not be received as conclusive, and in *Martinique* it would not. And are we to take theirs as conclusive upon notions of *comity*, which are not reciprocal? *Comity*, however, has never in *England* made such a judgment as this conclusive. The general doctrine shall be shown bye and bye, at present the peculiar reasons will be given why this proceeding cannot affect the plaintiffs—1. *The plaintiffs were no parties to it.* By the record it appears that the vessel and cargo were seized on the 6th of October 1810, by an order of the 5th, at the instance of the defendants, and others. Their petition stating their right and claim, &c. on the 9th, and a final judgment in their favour on the 11th. Upon this judgment the defendants now stand; under it they received the money. There was no new judgment pronounced. This is obvious from the sentence of the 11th and that of the 16th. *B. Nicholson* arrived after the first judgment. He had no choice but to remonstrate and ask a revision, &c. and he did so; but the court refused to annul it; and so it was executed. If he had not remonstrated, the judgment would have been executed, and his remonstrance produced no change. This did not make the plaintiffs parties to a judgment which had been passed before their agent arrived. A foreign judgment cannot have greater force than a domestic judgment of a court not of record; and such a judgment does not generally bind those who are not parties. 1. Decrees of the court of chancery 2. E·clesiastical courts. In the *Dutchess of Kingston's* case, 11 *St. Tr.* 243, a sentence or jactitation of marriage was not conclusive, because it was offered against other parties, (in a prosecution for bigamy,) also *per fraudem*. The maxim of law is, "*res inter alios acta tertius nec nocet nec prodest.*" It would be monstrous if it were otherwise. It may be said that admiralty sentences, in cases of prize, show the contrary. This is upon the presumption that all the world are *parties* to prize causes; and it fortifies what is contended for on the part of the plaintiffs. *Croudson vs. Leonard*, 4 *Cranch*, 437. But the conclusiveness of admiralty·sentences, (*in personam* as well as *in rem*,) is an anomaly now almost universally condemned. In *Lothian vs. Henderson*, 3 *Bos. & Pull.* 499, which went up to the House of Lords, and in which all the judges delivered their opinions *seriatem*, it appears that almost all of them condemned the doctrine, although they considered themselves bound by positive decisions to adhere to it; and Baron *Grahame* gave his opinion against it. In *Fisher v. Ogle*, 1 *Campb.* 418. *Park*, 494, 6, 7, and 1 *Marsh.* 435, Lord *Ellenborough* calls it *an overstrained comity;* and in *Donaldson vs. Thompson*, 1 *Campb.* 429, 1 *Marsh.* 435, he says, "I am by no means disposed to extend the comity which has been shown to these sentences of foreign admiralty courts. I shall die, like Lord *Thurlow*, in the belief that they ought never to have been admitted. The doctrine in their favour rests upon an authority of *Hughs*

*v. Cornelius*, 2 *Showers*, 232, which does not fully support it, and the practice of receiving them often leads to the greatest injustice." In the *United States*, some of the state courts have rejected the doctrine; and such as have admitted it, have relied upon grounds peculiar to admiralty sentences, and have reluctantly received it after all. However this may be, the reason of the doctrine maintains the objection that the plaintiffs, not being parties to the judgment at *Martinique*, under which the defendants claim, they are not bound by it. In truth, with reference to the personal rights of *Maryland*, citizens out of the jurisdiction of the court, the court had no jurisdiction, (except as they might be affected by jurisdiction over the thing.) Even Lord *Kenyon* admits this in his remarks on Lord *Hardwicke's* observations about the *Welch* decree. *Galbraith vs. Neville*, 1 *Dougl*. 6, (*note*). And in the latter part of his opinion he says, the foreign courts must have competent *jurisdiction*. Now here the court in *Martinique* had none over the plaintiffs, and therefore could not affect their rights. And here may interpose a short inquiry. The rights were personal, and the court of *Martinique* had no jurisdiction over their persons. It might do as it pleased with the *thing* while in its power; but the *rights and interest in the American proprietors*, it could not reach, because they were not in its power or amenable to it. The *thing* being in *Martinique*, it could act upon it and bind it by a proceeding *in rem*, so as to protect purchasers, and force the proceeds into whose hands it thought fit. But there the power stopped. The reciprocal rights and obligations of the present plaintiffs and defendants remained as they were; for the judgment could not act *in personam*—the parties not being amenable to the jurisdiction. The judgment, therefore, produced the effect of putting the money into the hands of the defendants by means of power over the thing; but having accomplished that result, the conflict between the *personal rights* of the *plaintiffs and defendants* passes *ad aliud examen,* and falls again (where indeed it always was,) under the jurisdiction of the law of this state, which created, defined and regulated them. In a word, the judgment did all that power over the *thing* enabled it to do. It could do nothing to change the relative personal claims of the plaintiffs and defendants, because it had no jurisdiction over the persons in whom those claims inhered. 2. But even supposing they were parties in form, can *comity* bind this court to shut its eyes to the substance of the fact? Was *B. Nicholson* authorised to make the plaintiffs parties? Look at his authority, as recorded in the proceeding. Nothing of the sort was intended or thought of. His business lay with the consignee or factor, and he could anticipate no dispute with him. He had the assignment of the bill of lading, and letters to *Marean,* &c. But moreover, look at the rapidity with which this proceeding went on. In *two days* after filing the petition by the defendants, judgment was pronounced. In *four days* after, *B. Nicholson* entered his remonstrance; his

remonstrance is overruled. He arrives on the 11th , and is compelled immediately to remonstrate, and in four days is dismissed, and with a fine. They were not a party to any purpose. 3. But the great objection is, that the judgment *upon the face of it*, is *manifestly unfit to be adopted as conclusive*, and that *consistently with it the present plaintiff's may recover*. Either this judgment is in the nature of a judgment on attachment, or it is founded upon the right of revendication before spoken of, as belonging to the *vendeur primitif*. It is expressly said to be the last of these upon the face of the proceeding itself, and so we must take it to be. If it had been the first, it had been palpably unjust, since the property appeared to be vested in the plaintiffs, and the note to the defendants was not due. Now we have already seen, that by the law of this state the *vendeur primitif* had no lien—no right of *revendication*. That the delivery to, and possession of *Wright*, had taken them away, and that the property, having passed to the plaintiffs for value, there could be no pretence for lien or revendication. even if the goods were *in transitu*, as they were not. Let us now inquire then—1. By what law the rights of the plaintiffs and defendants ought to be decided? Whether they depend on the law of this state, or that of *Martinique?* And 2. By what law the court of *Martinique* undertook to decide them? 1. The reciprocal rights of these plaintiffs and defendants depended altogether upon the law of this state—*Lex domicilii*. 1. Because the law of their domicil. 2. Because the law of the transaction—*Lex rei gesta;* for it was entirely a *Maryland* transaction —begun there and intended to end there—passing through *Martinique* for a moment. 1. The parties were citizens of this state, and the transaction was a *Maryland* transaction. Law of the domicil and the *lex rei gesta* the same, and ought to have been applied to the case. *Burrows vs. Jemino*, 2 *Stra.* 733. 12 *Vin. Ab.* 17, pl. 9. *De Sobry vs. Terrier*, 2 *Harr. & Johns* 191. Rights to personal things *follow the domicil of the parties.* Succession *ab intestato*, &c. So a transaction may depend on the place where carried on, and intended to be concluded. *Sill vs. Worswicke*, 1 *H. Blk Rep.* 690. *Philips vs. Hunter*, 2 *H. Blk. Rep.* 406. *Piper vs. Piper*, *Ambl.* 25. *Thorn vs Watkins*, 2 *Ves* 35. In our case it is undeniable that the parties could have had no rights but such as the law of this state gave. They were all citizens of this state, acting as *Maryland* merchants. The sale of the flour—the note of hand payable in *Baltimore*—the delivery of the flour—shipment—assignment of the bill of lading—deed of trust—all *Maryland* acts, looking to the law of *Maryland* peculiarly and exclusively. It was intended, to be sure, by *Wright*, that the flour should go to *Martinique*, and be there sold; but returns were intended, and therefore the whole affair was intended to *end* as it had been begun and carried on in this state. But the court in *Martinique* has confessedly, upon the face of the judgment, applied the law of that Island to the case. Is it fit that the law of that Island

should supplant the law of *Maryland?* Is it not unjust? It is consistent with the duty of this court to take what it sees to be a *French* rule for a guide, where the law of this state ought alone to determine? It is contended that it is unjust, and that this injustice and impropriety appear *upon the face of the French proceeding.* *Buchanan vs. Rucker,* 1 *Campb.* 63, 180, b. Now here there is a vice on the face of the proceeding. It professes to adjudicate by a law which has nothing to do with the rights of the parties. This is the grossest injustice, which the administrators of the law really applicable to those rights, cannot and will not tolerate. They must abdicate their duty first. Let it be remembered, that no foreign judgment is binding in itself. It is *comity* alone to which it owes the respect which is paid to it. The great reason why a foreign sentence binds at all, even from *comity,* is that the foreign tribunal is presumed to understand the law of the case; that is, the law by which itself is bound, or of its own country, better than the court before which the foreign sentence is produced. As if the sentence turns upon a point of local law properly applicable to the subject, it ought to be respected, because it is of much greater authority to show what that law is, than any other which can be produced. This reason presumes, however, that it is the local law which ought to give the rule, and consequently does not apply where the decision ought not to be upon the law of the place where the first tribunal sits. For example, in this case, the rule ought not to have been the law of *Martinique*—the *lex rei scitæ,* but *the law of Maryland*—the *lex domicilii* and the *lex rei gesta.* The court of *Martinique* knew nothing of the law of *Maryland,* and did not profess to apply it. This court understands that law. By receiving the sentence then as conclusive, this court invert the motive. This court receives the foreign sentence, because the foreign court is supposed to know the law of the case—the *lex loci,* better than this court. But here confessedly the foreign court knew nothing of the law of the case, (as it was not the *lex loci,*) and it is this court that knows it. This court then is called upon to take their ignorance for its guide, and to give up its own peculiar knowledge to *comity,* upon the foundation of a rule which intended to provide for the court's *instruction,* not for its *stultification.* Such *comity* would be a crime. It would be to give to a petty tribunal in *Martinique* a power to repeal the law of this state—to trammel our judicatures—to fix its patches upon our jurisprudence, and wrest our rightful jurisdiction from us. Let us look again at the case of *Burrows vs. Jemino,* 2 *Stra.* 733 1. The thing and the parties were within the jurisdiction of the court at *Leghorn;* and 2. "The Lord Chancellor was clearly of opinion, that this cause was to be determined *according* to the local laws of the place where the bill was negotiated," &c. And hence he considered the decision of the court, administering that local law, binding upon

1815.

Owing & Cheston
vs
Nicholson & Wil-
liams

him. It was the highest evidence of that law, by which the case ought to be decided. Is this so here? Who will maintain that the law of *Martinique* ought to be the rule on this occasion; or that a *Martinique* sentence ought to bind, because it furnishes the best evidence of that law, in a case where that law ought to have no effect whatsoever? The judgment of the court of *Martinique* is erroneous on the face of it, as applying a law which was not applicable. So in the case of an award, if an error in law appears on the face of it, although the judges are of the parties own choosing. But 2. The plaintiffs may recover consistently with that judgment. The first judgment has nothing to do with the plaintiffs' rights. It acts only on those of the defendants, as they represented them. The rights of the plaintiffs may therefore, without violence to that judgment, be now enforced Let the first judgment conclude as far as it goes, and what does it say? That (without looking to the rights of the plaintiffs,) the defendants ought to be paid out of the proceeds of the flour. Be it so; but we are *now* looking to the plaintiffs' rights, upon which that judgment says nothing, and against which of course it can conclude nothing. Push it as far as it can go, and the plaintiffs are clear of it. But suppose the opinion pronounced upon the plaintiffs' rights in the second judgment, (under which it is always to be observed the defendants do not claim,) is taken in, and what does *that* amount to, taken in connexion with the first, and interpreted as largely as possible? Simply, that *by the law of Martinique*, (which that court believed itself bound by,) it was of opinion that the defendants were entitled to be paid. Agreed—but it is consistent with that opinion to give the plaintiffs redress *by the law of Maryland.* That opinion may be correct, and yet the plaintiffs may be entitled to recover. It may *conclude*, and yet the defendants may be obliged to refund. It may be true that by the law of *Martinique* the defendants had the right of revendication, and to take in satisfaction of their debt the property of the plaintiffs, and it may also be true, that by *the law of Maryland* they ought to refund to the plaintiffs what, by that law, belongs to them. As an evidence of local law let the foreign opinion be respected, (and it claims to be no more than an opinion upon local law;) but if the case is out of that foreign law, and belongs to the *domestic code*, the turn of this court to adjudicate upon the merits, has now arrived without any disrespect to that opinion; and it is now the province of this court to apply the *domestic rule*, not hitherto touched by any judgment, and consequently perfectly at large. In a word, the whole of this case is open without impeaching the judgment at *Martinique*, which has never decided upon the rights of these parties by any law on which they depended. That decision remains to be given here. And here the case of *Moses vs. Macferlan*, 2 *Burr.* 1009, is in point, where it was said—"The ground of this action is consistent with the judgment of the court of conscience. It

admits the commissioners did right. They decreed upon the endorsement of the notes by the plaintiff, which endorsement is not now disputed. The ground upon which this action proceeds was no defence against that sentence." "The ground of this action is, not *that the judgment was wrong*, but that *(for a reason* which the now plaintiff could not avail himself of against that judgment,) the defendant ought not in justice to keep the money." Now here the opinion is not impeached, that "*by the law of Martinique* the defendants ought to have recovered." The plaintiffs only insist, that by the *law of this state*, which furnishes the true rule, *but of which in the court of Martinique the plaintiffs could not avail themselves*, the defendants ought not to have recovered, and therefore cannot now in justice keep the money. And observe too, that in *Moses vs. Macferlan*, the parties before the court of King's Bench, were the same parties who were before the court of conscience. The tribunals were both domestic—the jurisdiction of the first tribunal was complete, and was not denied, yet as the point upon which the plaintiff claimed in King's Bench had not been denied in the court of conscience, although it was material to the merits, the former court thought itself not precluded from going into it. In the present case there are different parties—the tribunal foreign—the jurisdiction denied. The authority of *Moses vs. Macferlan* may be vindicated against the opinion of Ch. J. *Eyre*, in *Phillips vs. Hunter;* and it is an authority to show, that *want of privity* is nothing in this action, and that even a *recovery in an adverse suit* is nothing. 3. But that the defendants cannot hold this money upon the *Martinique* judgment, because they obtained possession of it *against the law by which they were bound*, which law, (the law of *Maryland*,) gave it to the plaintiffs. As between them and the plaintiffs the law of this state is the rule and measure of their rights. Both were bound by that law. The defendants have resorted to a *Martinique* tribunal to get rid of that law, and to violate those rights. The very production of such a sentence is a wrongful act. It is *in fraudem legis*. The law of *Maryland* says, "you shall not seize or obtain payment of your debt out of this flour." By a direct infraction of that law, they have made use of a foreign tribunal, ignorant of the law of *Maryland*, and unwilling to apply it, to seize the flour, and obtain payment of their debt out of the proceeds. They sail against the wind and tide of the law, by which they are bound—by which the transaction was impressed. They bid defiance to it, and set up a trick and an evasion against it. It is impossible that any thing which deserves the name of jurisprudence can suffer this. Such, will be shown, are the authorities—the best weighed and most maturely considered. But before that is done, let us take a slight view of the general authorities respecting foreign judgments, upon which the defendants have relied. The cases are all collected in 1 *Dougl. (in a note,)* from page 4 to 6, subjoin-

ed to the case of *Walker vs. Witter*, which is itself an authority upon this matter, where Lord *Mansfield* says, "foreign judgments are a ground of action every where; *but they are examinable.*" *Crawford vs. Whittal,* (in the note) is to the same effect. In *Sinclair vs. Frazer,* (also in the note,) it is said to be *prima facie* evidence, and that it lies on the defendant to impeach the justice thereof, or to show the same to have been *irregularly or unduly obtained.* *Plaistow vs. Van Uxem,* (also in the note,) is to the same effect. In *Galbraith vs. Neville,* (also in the note,) Lord *Kenyon* was for making it conclusive. *Buller,* J. "A foreign judgment is conclusive till impeached by the other party." "A foreign judgment is only to be taken to be right *prima facie;* that is, we will allow the same force to a foreign judgment that we do to those of our own courts not of record." "In short, the result is this, that it is *prima facie* evidence of the justice of the demand in an action of *assumpsit, having no more credit than is given to every species of written agreement,* viz.—That it shall be considered as good until impeached." It is clear then, from all these general authorities, that if the defendants were plaintiffs, to obtain here the effect of their judgment in *Martinique,* they could only use it as *prima facie* evidence. Why should they have a larger benefit from it when they offer and rely upon it as defendants? In none of the cases is this distinction taken, until it was taken by Ch. J. *Eyre,* in *Philips vs. Hunter,* 2 *H. Blk. Rep.* 402, and there he was overruled by all the judges in the Exchequer Chamber, and Lord *Loughborough* was against him in the common pleas. *Buller,* J. indeed, attributes to Lord *Hardwicke* such a distinction in the case of the *Welch* decree, affirmed by the House of Lords. But that was a case in chancery, and turned upon the maxim, that he who seeks equity shall first do it. And moreover it was a domestic decree by reason of its affirmance by the House of Lords, and quite impossible that Lord *Hardwicke* should disturb it. It was going a great way to say, that if he was called upon to enforce it, he would examine into its merits. The distinction is in itself unfounded and idle. If the judgment is good as a defence, it is good as a claim. In both cases this court is called upon to respect and enforce the foreign judgment. Independently of that judgment the plaintiffs have a right to recover. The defendants set up the judgment to take away that right, and consequently ask the court to give effect to it. Does he who pleads a bond as a discount, less call upon the court to set up and enforce the bond, than he who brings an action upon it; and will the bond do in the one case what it will not do in the other? Either the foreign judgment is binding in its own nature, or it is not. If it is binding, it ought to be enforced for a plaintiff as well as a defendant; if it is not binding, this court cannot make it so. The defendants say this judgment is conclusive. How? In itself?—No, for then it would be conclusive for

a plaintiff. How then? No answer can be given. Do they not ask an effect for this judgment? Must you not *give effect* to it (if you do as they ask,) by your judgment? Could you give greater effect to it on behalf of a plaintiff? They do not rely upon the mere *vis inertiæ* of this foreign judgment. They rely upon your adoption of it—Upon your forming an alliance with it—Upon your reinforcing it by your own judicial aid—Upon your communicating to it life and strength and power. Put this foreign judgment out of the way, and have the defendants any case? None. Upon what then do they lean but upon this judgment? And what is this judgment, if you do not execute and enforce it against the plaintiffs to the destruction of their case? We come now to the cases of attachment decided in *England* in favour of assignees against general creditors, which are absolutely conclusive. *Hunter vs. Potts,* 4 *T. R.* 182. *Sill vs. Worswick,* 1 *H. Blk. Rep.* 665. *Philips vs. Hunter,* 2 *H. Blk. Rep.* 402. This last case was error in the exchequer chamber, from a judgment in King's Bench, in a case decided immediately after *Hunter v. Potts,* which was considered as settling the law. In *Hunter v. Potts,* the whole argument of the court proceeds upon a supposition, that if the owner (the bankrupt,) had himself assigned, in the usual course of business, his assignee might recover, *which is exactly our case.* In that case both parties were *English* subjects, &c. In *Sill vs. Worswick* the court say, "personal property has no locality, but is subject to that law which governs the person of the owner." Our case is more favourable than *Philips vs. Hunter,* because the property here went from *America,* and was on its way back through *Martinique.* In *Philips vs. Hunter* it was not so, the defendant in that action brought it to *England* by means of his attachment, and it might not have got there otherwise. In that case all the parties were *English* traders, and *English* subjects. The debt from the bankrupt to the defendant was contracted in *England.* It was a case between *English* subjects upon *English* property. So here in our case, the parties are *Maryland* traders, and *Maryland* citizens. The debt from *Wright* to the defendants was contracted in *Maryland.* It was a case more emphatically between *Maryland* citizens, upon *Maryland* property, for not only the debt to the defendants was contracted in *Maryland,* but the property, out of which they took payment, was shipped in *Maryland,* and was to return to *Maryland.* In *Philips vs. Hunter,* the court compares the case under the bankrupt law to a transfer by the bankrupt himself, which it takes for granted would defeat the attachment. They say the parties were bound by the law of their own country. That applies exactly here. The opinion of *Eyre,* Ch. J. (who differed with the court,) sets out upon a false assumption, that the plaintiff's demand must be judged of according to the law of the foreign tribunal.

*Curia adv. vult.*

At this term the opinion of the court was delivered by

CHASE, Ch. J. This opinion the Reporters regret they have not been able to procure. The result of it however, was, that this court dissented from the opinion of the court below in the *first* bill of exceptions, and concurred with that court in the opinions in the *second* and *fifth* bills of exceptions.

BUCHANAN, J. dissenting from the opinion of the court, delivered the following opinion: I regret that I cannot unite with my brethren in the judgment pronounced in this cause, but will endeavour to give my view of the subject, in which I have the less confidence, being unsupported by the opinion of either of the other members of the court, on the principal question presented for consideration.

This case is brought up on three bills of exceptions, No. 1, 2 & 5, in the record, taken at the trial, on the part of *Owings* and *Cheston*, the appellants. The exceptions No. 3 & 4, taken on the part of the appellees being waived, and forming no part of the subject of this appeal, have not been examined into.

The question growing out of the first bill of exceptions is, whether parol evidence of a foreign judgment can be received? And I think the court, before whom the case was tried, did right in not suffering such evidence to go to the jury. It is not to be questioned, that if a foreign judgment had been produced, *Benjamin Noland* might have given evidence that the money he received was paid in pursuance of that judgment. But no such judgment, or copy of such judgment, being produced, the circumstance that he had been examined on the part of *Nicholson* and *Williams*, to prove that he had received the money in question from *Tuttle*, and paid it over to *Owings* and *Cheston*, affords no foundation for letting in his deposition, taken on a cross examination by them, to prove that proceedings were instituted in a court at *St. Pierres*, to which *Nicholson* and *Williams* were parties, and that a sale of the property proceeded against, was definitively decreed for the payment of the claim of *Owings* and *Cheston*, and others. That was the testimony offered, and if it had been received, there would have been no necessity for producing the judgment to enable the court to see who were parties, and what was decided by it, and thereby to judge of its legal effect; since it would have been already proved, that the proceedings were *in rem*, that *Nicholson* and *Williams* were parties to those proceedings, and that the judgment was against the thing, the proceeds of which form the matter of controversy in this suit, and the effect of the judgment, to be collected, not from evidence offered by the judgment itself, but from *Noland's* loose impressions of its import; which would be subversive of the established rule of evidence, that authenticated copies of records are

required, in the absence of the originals, as the next best evidence, and cannot be supplied by parol. And the whole of a record, and not a partial extract, must be produced, in order that the court may be put in possession of the full effect of it; for a part only may have an import, materially different from the whole taken together; and the object, with a view to which the whole record is required, would be equally defeated, by the admission of parol evidence. And so with regard to proceeding in foreign courts, the reason and the law are the same. It is to the rejection of the evidence offered, of the proceedings and judgment in *Martinique*, that the exception is to be considered as taken, and not the admission of the process, that *Noland* received the money, in the character, and under the impressions, stated in his deposition, by which *Owings* and *Cheston* were in no way prejudiced. And as *Noland's* impressions were not very material, I have not examined how far the court was right in suffering them to go to the jury, and shall not, for that reason, quarrel with the opinion.

There are two questions arising on the *second* bill of exceptions—1. Whether the assignment by *Wright* of the 24th August to *Nicholson* and *Williams*, of the bill of lading, and his deed to them of the same date, passed the property in the cargo of the brig *Hunter* to them. And 2. If they did, whether they can, in this form of action, recover from *Owings* and *Cheston*, so much of the proceeds of the cargo as was received by *Noland* from *Tuttle*, and by him paid over to them.

In support of the negative of the *first* proposition, it is contended—1st. That *Wright* purchased the flour, which formed the cargo, in contemplation of failure, with a view to secure *Nicholson* and *Williams* against certain liabilities incurred by them on his account. That the purchase was fraudulent and void, and therefore that the property in the flour did not pass, and not being in him, he could not transfer it to another: And 2d. That if *Wright* did acquire a property in the goods, his assignment and deed to *Nicholson* and *Williams*, amounted to an undue preference, to the prejudice of other creditors, and were therefore void. But neither of these positions can be sustained. If it should be admitted, that a purchase of goods, in contemplation of failure, and with a view to secure a favoured creditor, would in law be fraudulent and void, yet the principle would not reach this case. It no where appears that *Wright* either was, or supposed himself to be in insolvent circumstances, or in danger of failure, at the time he purchased the flour; or that he made the purchase with a view to secure *Nicholson* and *Williams* in preference to other creditors. But the converse may be collected from the facts in the cause; for it is in proof, that he had purchased from *Owings* and *Cheston* more flour than that, for which his note to them was given; but that the vessel he was about to load, not being able to carry the whole, he re-

1815.

Owings & Cheston
vs
Nicholson & Wil-
liams

turned to them what could not be put on board, and passed his note for the balance. Now, if he intended a fraud, or made the purchase with a view to the preference contended for, it is not to be presumed that he would have returned any part of the flour, but would have applied it to the purpose for which the purchase was made; and more particularly when the whole amount of the flour was not equal to the liabilities, which *Nicholson* and *Williams* had incurred on his account, and his not having done so, precludes the suspicion that he made the purchase with a view to an improper preference, and exempts the transaction from the imputation of collusion between him and *Nicholson* and *Williams*, for their benefit, at the time the flour was purchased. And the objection that the assignment of the bill of lading, and the deed to *Nicholson* and *Williams*, are void on the ground of undue preference, is not better supported. At common law, a debtor may secure one creditor, to the exclusion of others, either by payment, or assignment of his property. The bankrupt laws of *England* are not in force in this state, and there is no act of assembly, that can be so construed, as to defeat the operation of either the assignment or deed in question. The insolvent act of 1805 provides, "that if any person shall be convicted of giving to any creditor or security an undue and improper preference, he shall be deprived of the benefit of the act." What amounted to "an undue and improper preference" under that act, became a question; and the legislature, in 1807, passed a law, in which it is provided, "that a deed made by any person, in favour of one creditor or security, in contemplation of becoming an insolvent debtor, shall be taken to be an undue and improper preference, within the meaning of the act of 1805." But by neither of those laws is it declared, that a deed, assignment, or any other act of undue preference, is fraudulent or void, or inoperative to pass the property. *Wright* indeed, by the preference given to *Nicholson* and *Williams*, forfeited all claim to the benefit of the act of 1805, and if he had applied for relief under that act, it would have been denied him, by which denial the law would have been gratified; for though, as a punishment on a debtor for giving such undue preference, the law withholds from *him* its benefits, it does not operate to the prejudice of the preferred creditor; but the deed by which the preference is given, remains in full force, and vests in him the property intended to be transferred, if in other respects it is regular, which seems to be the case here. With respect to the bill of lading, it is an assignable instrument, and it is a common mode of transferring the cargo of a vessel. And the assignment in this case, made when the brig *Hunter* was at sea, proceeding on her voyage to *Martinique*, is clear of all exception; and *Nicholson* and *Williams*, having paid the amount of the debts, (as security against which the transfer was made,) before the money was received by

1815.
Owings & Cheston
vs
Nicholson & Williams

*Noland,* from *Tuttle,* the property in the cargo became absolute in them.

It remains then to inquire, *Secondly,* whether, having a right to the property, they can in this form of action recover from *Owings* and *Cheston* such part of the proceeds as came to their hands? Of which it seems to me, there can now be but little doubt. Having a complete legal title to the property, they had an equal right to the proceeds. And a part of those proceeds having come to the hands of *Owings* and *Cheston,* without right, the law considers it as received for the use of those, who *ex equo et bono,* are entitled to it, and raises an implied promise to pay, on which an action for money had and received will properly lie. I think therefore that the *second* exception cannot be supported.

The *fifth* bill of exceptions presents this case in a different view, and the question is, how far the right of *Nicholson* and *Williams,* to recover in this action, as supported by the facts set out in the *first* and *second* bills of exceptions, is affected by the proceedings in the court of the first instance in the Island of *Martinique.* To which it is objected—1st. That *Nicholson* and *Williams* were not parties to those proceedings; and 2d. That if they were parties, those proceedings are not conclusive on their right to the matter in controversy.

It is a well established principle, governing the courts in *England,* that a judgment or sentence of a foreign municipal, or admiralty court, having competent jurisdiction, is conclusive in a case between the same parties, upon the same matter coming incidentally in question. The same principle has been adopted by the courts of *Pennsylvania,* and the Supreme Court of the *United States;* and for the same reasons governing them, I shall consider this court as bound by the same rule. In the case of *Sill vs. Worswick,* 1 *H. Blk.* 665, referred to in the argument, it is ruled, that if a *British* subject becomes a bankrupt, and another *British* subject, a creditor, recovers his debt by attachment against the property of the bankrupt, in a foreign country, after the bankruptcy, and returns to *England,* the assignees of the bankrupt may, in an action against him for money had and received, recover back the money so obtained. That case turned altogether upon the operation of the bankrupt laws of *England.* But in deciding that case Lord *Loughborough* expressly distinguished it from the case of a creditor not affected by the bankrupt laws, who recovers his debt by attachment in a foreign court, against the effects of the bankrupt; and says, that in such a case the creditor who has so obtained his debt, cannot, on going to *England,* be made liable to refund that debt. And he says further, that if in the case before him, the assignees had sent a person to *St. Christophers* to act for them, if notice of the assignment had been given to the court of *St. Christophers,* and that court had preferred the title of the creditor using the process of attachment to theirs, though he should think the determination wrong,

yet it could not be revoked in *England*.  And the same principle is sustained in the case cited of *Rapalje vs. Emory*, in the Supreme Cour* of *Pennsylvania*, 2 *Dall. Rep.* 231, and in *Croudson and others*, vs. *Leonard*, in the Supreme Court of the *United States*, 4 *Cranch*, 434.  We have seen in this case, that the cargo of the brig *Hunter*, which was consigned to *Silas Marean*, a merchant in *Martinique*, was transferred by *Wright* to *Nicholson* and *Williams*.  On the arrival of the vessel at *Martinique*, *Benjamin Noland*, the agent of *Owings* and *Cheston*, and others, caused proceedings in their names to be instituted against the cargo, to recover the amount for which they sold the flour to *Wright*.  The proceedings were *in rem*; and in the petition it is stated, "that *Wright*, having formed the project of a fraudulent bankruptcy, bought the flour, and a few days afterwards stopped payment and failed, after having made to certain persons, fictitious creditors, a fraudulent conveyance of his property."  The consignee of *Wright* appeared to the proceedings, and after counsel being heard on both sides, a judgment of condemnation, on a view of the whole case, was passed—and a fraudulent conveyance to fictitious creditors being alleged in the petition, and made a part of the foundation of the proceedings, and *Nicholson & Williams* being the only persons to whom a conveyance had been made, it may perhaps be presumed, that the transfer to them was examined into by the court.  I shall not examine how far those proceedings (being *in rem*,) affect the right of recovery in this case; they are in the cause.  But if it should be admitted that they are not conclusive, *Nicholson* and *Williams*, not being named as parties, there were further proceedings in the same court, to which they were clearly parties.  The day after the judgment of condemnation, and before it was executed, *Benjamin Nicholson*, the agent of *Nicholson* and *Williams*, caused proceedings to be instituted in their names, in relation to the same property, called a third opposition.  The petition states, that the property was not *Wright's* but belonged to *Nicholson* and *Williams*, and sets out the deed from *Wright* to them.  It reclaims the property, recites the judgment of the 11th of October 1810, alleges that it was obtained by misrepresentation, asks to be permitted to make opposition to the execution of it, and prays that it may be annulled by a new judgment.  It alleges that the means of a third opposition is open to them, that they cannot too hastily put the court in a situation to pronounce on the subject of their claim, and prays to have all the parties to the first proceedings summoned to an immediate audience.  The court recognized the third opposition, and ordered the parties to be summoned, to the end requested; and on the 16th of October 1810, a judgment was pronounced against the plaintiffs.  But it is said that *Benjamin Nicholson* had no authority to bring suit, and that if he had, the proceedings instituted by him do not make *Nicholson* and *Williams* parties to the judgment of the 11th

of October 1810, and on this the argument principally hinged—The letter from *Joseph H, Nicholson* of the 31st of August 1810, affords the only evidence of *Benjamin Nicholson's* authority. But that letter is very comprehensive. It is not in truth, an instrument *giving* the authority to *Benjamin Nicholson*, but a letter to *Silas Marean* the consignee of the ship and cargo, informing him of the mission of *Benjamin Nicholson*, and of the authority with which he was clothed. It is stated in that letter, that *Benjamin Nicholson* goes out with *full powers* to take possession of the brig *Hunter* and her cargo, and carries with him the deed of indenture from *Wright* to *Nicholson* and *Williams*. Now, if *Benjamin Nicholson* had *full powers* to take possession of the brig *Hunter* and her cargo, it would seem to follow, that he had power to take such possession in any manner that circumstances might render necessary, whether with or without legal process. And the circumstance that he took with him the deed of transfer from *Wright*, connected with the mention that is made of an agent having gone out, for the purpose of attaching the property for the use of *Owings* and *Cheston*, and others, goes a great way to show, that it was intended to arm him for legal controversy; and to enable him in a court of justice to resist, by that evidence of title in his employers, any proceedings that might be instituted against the property. For it was only in a court of justice that such evidence of title was necessary, as there was a postscript at the foot of the letter, by *Wright*, the consignor, to *Marean*, the consignee, directing him to conform to the instructions contained in that letter. Besides, *Marean* himself (in the language of the letter,) is requested to use *all exertions* for the interest of *Nicholson* and *Williams*, which is certainly an authority to assist *Benjamin Nicholson* in any measures he might find it necessary to adopt in order to get possession of the property. And if he had authority so to assist *Benjamin Nicholson*, it would seem to follow, by necessary implication, that *Benjamin Nicholson* had authority to pursue whatever steps might be necessary. Moreover, the petition was preferred and signed by an attorney of the court, and the authority of that attorney to do so recognised by the court; and the judgment itself, on the face of it, is stated to be between. *J. H. Nicholson* and *N. F. Williams*, &c. of the one part, and the Messrs. *Ellicotts*, and *Owings* and *Cheston*, of the other part. Considering *Nicholson* and *Williams* then, both in form and substance, as parties, at least to the proceedings prosecuted in their names, and the judgment thereon, the question, whether they are thereby concluded, next presents itself, which does not seem to me to be very difficult of solution. I have before assumed it as a principle, that judgments of foreign courts of competent jurisdiction, are conclusive between the same parties, upon the same matter, when brought in collaterally as this is; they are evidence of their own correctness, and conclusive of

the matter upon which they profess to decide, even though such decision be manifestly unjust; and if they state the evidence from which the conclusions are drawn, no other court can inquire whether such conclusions are right or otherwise. They may, to be sure, be looked into, not for the purpose of examining if the decision is right, but to see if the matter in controversy is decided. What then is this case? *Nicholson* & *Williams* submitted themselves to the authority and jurisdiction of the court of the first instance in the Island of *Martinique*, having jurisdiction over the matter. Their title to the thing in controversy in this case, was made the subject of judicial investigation, and upon a full hearing of the case, judgment was pronounced against them; not, as has been argued, a mere refusal by the court to revise or suspend the execution of its former sentence, but a solemn judgment against their title. And that is evidenced by the judgment itself, which sets out the grounds upon which it is founded. It adverts to the epoch of the purchase of the flour by *Wright*, and of his deed to *Nicholson* and *Williams*; to the circumstance that it was a deed of trust, and to the relationship subsisting between *Nicholson* and *Wright*, and draws the conclusion that the flour was held for the use of *Wright*—casts the plaintiffs from their reclamation, and condemns them to pay a fine of all the costs of suit. It is not very material whether by the process of the third opposition, *Nicholson* and *Williams* became parties to the proceedings that had before been instituted by *Owings* and *Cheston*, or not. It is enough that the proceedings by *Nicholson* and *Williams* were recognised and sanctioned by the court, as correct and regular, according to the laws and regulations under which the court professed to act; that their rights were investigated, and a judgment pronounced against them. It is said, to be sure, that nothing was adjudged in that case to *Owings* and *Cheston*. But what of that? Is it not the ordinary case of a judgment against a plaintiff in a question of right in our own courts, in which nothing is adjudged to the defendant but his costs, (as in this case)? And in a subsequent suit between the same parties, for the same thing, would not that judgment be just as conclusive against the plaintiff, as if he had been the defendant in the first suit, and judgment pronounced against him? I can see no difference between the cases, and it is impossible there can be any, if foreign judgments are put upon a footing with domestic. But suppose *Noland*, the agent of *Owings* and *Cheston*, had got possession of the cargo of the brig *Hunter*, without the judgment or authority of any court, and *Nicholson* and *Williams* had instituted proceedings to recover the property, and on a full hearing of the case, judgment had been pronounced against their right—could they afterwards recover in a suit for the same thing in one of our courts? And if they could not, will it be said that *Owings* and *Cheston* are placed in a worse situation, by having obtained possession of the proceeds of the flour un-

1815.

Owings & Cheston
vs
Nicholson & Williams

der the authority of a judgment in their favour, than if they had got it without? I perceive no ground for such a distinction. The proceeding by *Nicholson*, the agent of *Nicholson* and *Williams*, in their names, called a third opposition, has been treated in argument as an appeal from the judgment of the court of the first instance; and if so, they clearly stand in no better predicament, than if it was an original proceeding. I think the judgment of the court in *Martin que* is conclusive, and that the court erred in giving a different opinion.

JUDGMENT AFFIRMED*(a)*.

*(a)*See the act of December 1813, *ch.* 164, entitled, An act concerning Sentences of Foreign Courts.